**BEAUMONT, S. L. & W. R. CO. v. RICHMOND.**

**No. 2546.**

Court of Civil Appeals of Texas. Beaumont.
Jan. 8, 1935.

Rehearing Denied Jan. 16, 1935.

W. G. Reeves, of Beaumont, Andrews, Kelley, Kurth & Campbell, of Houston, and Butler & Pipkin, of Beaumont, for appel'ant.

J. L. C. McFaddin, of Beaumont, for appellee.

WALKER, Chief Justice.

On the 4th day of September, 1931, appellee, Otis Richmond, drove his automobile into one of appellant's freight trains as it stood across the public highway, lead:ng from the town of Nome through the town of Grayburg to the town of Sour Lake, at a point on the north edge of the town of Grayburg on the side nearest to the town of Sour Lake. Appellee, with two companions, late at night, was driving from Nome to Sour Lake. The jury assessed damages in favor of appellee, for his personal injuries, $1,060, and for damages to his automobile, $225. Many acts of negligence were charged against appellant and found in favor of appellee; but, for the purposes of this opinion, we give only the following special issues which have support in appellee's petition, and which were answered. as indicated:

"Special Issue No. 11. Do you find from a preponderance of the evidence that the conditions surrounding the crossing in question were such as to render that crossing more

than ordinarily dangerous as a night-time crossing?" Answer: "Yes."

"Special Issue No. 12. Do you find from a preponderance of the evidence that the defendant knew of such conditions surrounding said crossing at the time of the question in question?" Answer: "Yes."

"Special Issue No. 13. Do you find from a preponderance of the evidence that the defendant's failure to provide wig-wag signals, or other signaling devices, for said public crossing constituted negligence under the facts, circumstances and conditions existing at the time of the collision involved in this case?" Answer: "Yes."

"Special Issue No. 14. Do you find from a preponderance of the evidence that such negligence, if any you have found, was a proximate cause of the collision involved in this case?" Answer: "Yes."

Acquitting appellee of all acts of contributory negligence charged against him by appellant, the jury found that immediately prior to the accident and upon the occasion in question he (a) did not fail to keep a proper lookout for any train which might be upon the crossing; (b) he was not driving his automobile with poor and insufficient lights; (c) immediately prior to the accident he did not fail so to control the speed of his automobile that it could not be stopped, with the means reasonably at hand, within the length of the open highway before him, which he could see to be free and clear of obstruction; (d) the speed at which he was driving his automobile was a contributing cause of the collision and his injuries; (e) he did not fail to bring and keep his automobile under proper control as he approached the crossing; (f) under the circumstances, he was not driving at a dangerous and an immoderate rate of speed; (g) he was not driving his automobile at a speed in excess of that at which a man of ordinary prudence would have driven under the circumstances then existing. The jury further found that the railroad crossing was not within a town or village at the time of the accident, and that the accident was not an unavoidable accident. Judgment was entered for appellee for the amount of damages found by the jury.

On two grounds appellant insists it should have had an instructed verdict: (a) The evidence failed to raise against it any of the issues of negligence submitted to the jury; and (b) as a matter of law appellee was guilty of contributory negligence.

Under the first proposition the facts are as follows: The Nome-Sour Lake highway, where it crosses appellant's railroad track, is a concrete highway, its width not shown. Appellant's freight train consisted of sixty-six cars and extended to the east of the crossing about 800 feet and to the west of the crossing about 500 yards. The train was on schedule time and, according to its regular custom, was stopped at that time and place for the purpose of taking on water. The engine was at the water tank about 800 feet east of the crossing. As appellee approached the crossing, the engine and its lights were obscured from his view by houses and staves and other obstructions along the railroad track until he was within less than 200 feet of the crossing. As he approached the crossing, appellee could not see the lights in the caboose and no lights were shown on the train between the engine and the caboose. Neither a flagman nor brakeman was out along the train while it stood across the crossing. At the time appellee struck the train it was standing still and had been standing still for at least five minutes. The crossing was blocked by a flat car, which extended beyond the concrete highway on the east and at least covered the concrete on the west. The flat car was a low-type car and to one approaching the crossing presented a barrier to his view across the highway of only about eight inches. As appellee approached the crossing, there was nothing for quite a distance to obstruct his view of the crossing except the flat car. The night was dark and hazy, with a little mist of rain. As appellee drove towards the crossing, he could see the lights of Sour Lake in front of him and over the top of the flat car; he could also see the crossing sign and the switch light on the other side and over the top of the flat car, but he did not testify that he, in fact, saw these objects. On the issue of lights we quote as follows from appellant's station agent's testimony, questions and answers reduced to narrative:

"That sign is about ten or twelve feet high, I guess. The top of it shows up there about ten or twelve feet above the ground, I judge; and the bottom is about six or eight feet. In other words, if there is a flat car standing on that crossing you could see that railroad crossing sign over the flat car. And if a flat car was standing on that crossing you could see that switch light, approaching from the south. And if there was not a flat car on the crossing you could still see them. In other words, whether there is a flat car on that crossing or not wouldn't make any particular difference as to those signs there. Those signs don't indicate there is a car on the

crossing but they indicate it is a crossing; but doesn't indicate it is obstructed or blocked in any manner."

The witness Harris testified, questions and answers reduced to narrative:

"I am acquainted with this crossing where this collision took place; well acquainted with it. I have driven over it a number of times. I sometimes drive a car. The facts in regard to the difficulty in seeing trains standing upon that crossing when approaching from the south, when a flat car is standing upon the crossing are that at night it is pretty hard to see it on account of the lights of Sour Lake, and then automobiles coming down the highway, the lights will shine right under the cars right down the highway, and if you didn't look pretty closely you wouldn't see it. If you were not expecting it you wouldn't see it at all. With a flat car standing across that highway you can see the lights of Sour Lake over the flat car easily.

" * * * The lights I testified to as obscuring or making the view clear on that crossing as you approach it from the south are residence lights."

Dr. Hart testified:

"Q. Dr. Hart, are you acquainted with that crossing down there? A. Yes, sir, I go over it.

"Q. Do you know the condition down there with regard to seeing the lights of Sour Lake in approaching that crossing from the south? A. Yes, sir.

"Q. Can you see them or not? A. Yes, sir."

At the crossing there was no flagman nor signal of any kind whatever to give warning to one approaching the crossing that it was occupied by appellee's freight train.

It is our conclusion that the facts and circumstances of this case were sufficient to carry to the jury the issue of negligence quoted above. When appellant stopped its train across the crossing, blocking it with a flat car, it knew that it was blocking an important and highly traveled highway, that one approaching the crossing would see a barrier across the highway only about eight inches wide, and that over the flat car he could see the lights of Sour Lake and over the flat car could also see the railroad crossing sign and the switch light. Prescott v. Hines, 114 S. C. 262, 103 S. E. 543, by the Supreme Court of South Carolina, presents a case where the defendant blocked a street in the city of Columbia with cars that had no light upon them nor near them, or any guard or watchman to give warning; the night was foggy and smoky, which made the cars standing across the street dark and obscured. It was held that the facts of that case were sufficient to take the issue of negligence to the jury. On their facts the following cases are interestingly in point: Missouri, K. & T. R. Co. v. Long, reported as follows: (Tex. Civ. App.) 293 S. W. 184; (Tex. Com. App.) 299 S. W. 854, on second appeal (Tex. Civ. App.) 23 S.W.(2d) 401 (writ refused); by this court, Texas & N. O. Railway Co. v. Dickson, 72 S. W.(2d) 384, and Orange & N. W. Railway Co. v. Harris, 57 S.W.(2d) 931. The facts of these three cases closely parallel the facts of this case.

Independent of its ordinary use and the ordinary conditions surrounding it, the particular conditions at a particular time may render a crossing extrahazardous. In Tisdale v. Panhandle & S. F. R. Co., 228 S. W. 133, 136, 16 A. L. R. 1264, the Commission of Appeals said: "It seems possible that the Court of Civil Appeals may entertain the view that, unless it be necessary at all times to maintain a flagman at a certain crossing, it is not necessary at any time to do so. We cannot concur in any such theory. Conditions surrounding a crossing may, and do, change materially from time to time. A flagman might not be required under the law at a certain crossing at one time, and yet it might be negligence to fail to provide one there at another time. The sole question for determination is whether or not at the time of the accident the conditions surrounding the crossing in question rendered it more than ordinarily hazardous or unusually dangerous."

And again: "The sole and only test is whether or not the crossing, in view of its environment and use, was unusually dangerous or attended with more than ordinary hazard at the time of the accident in question."

See, also, Baker v. Streater (Tex. Civ. App.) 221 S. W. 1039.

The blocking of the highway by the flat car at the time and under the attending circumstances raised the issues that the crossing was extrahazardous and that it should have maintained some sort of a device at the crossing to warn those using the highway. For additional authorities, see Baker v. Hodges (Tex. Civ. App.) 231 S. W. 844; Chicago, R. I. & G. Railway Co. v. Zumwalt (Tex. Com. App.) 239 S. W. 912; Tisdale v. Ry. Co. (Tex. Com. App.) 228 S. W. 133, 16 A. L. R. 1264; Missouri, K. & T. R. Co. v. Hurdle (Tex. Civ. App.) 142 S. W. 992; Texas

Midland Railway Co. v. Wiggins (Tex. Civ. App.) 161 S. W. 445.

■ On the issue of contributory negligence, as a matter of law, the following additional statement is made: Appellee's headlights were in good condition, sufficient for him to see at least 50 yards ahead of him through the haze and mist as he approached the crossing. The lights were sufficient for him to have stopped his automobile in safety at his rate of speed, had he seen the train as it stood across the highway within the radius of his lights. He testified that had there been a box car on the crossing, or a light or a wigwag or anything to give him warning of the presence of the flat car, he could have stopped his automobile at his rate of speed within the radius of his lights. Because the railroad crossing was rough, he slowed his automobile down to about twenty-five miles per hour after crossing the spur track about 200 feet from the crossing.

It is true that appellee, for a long distance, had an unobstructed view of the crossing covered by appellee's freight train, but Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S. W. 139, is authority for the proposition that, though one may have an unobstructed view of the crossing, yet the "distractions" of the moment may make the issue of contributory negligence a fact issue for the jury; this record is full of "distractions," as shown by the statement above made. On appellee's right as he approached the crossing his view of the engine and that part of the train to the right of the crossing was obscured; the lights shining above the flat car created the illusion that the crossing was not occupied; appellee could see over the top of the flat car, the switch lights, and the crossing sign. Trochta v. Missouri, K. & T. R. Co., 218 S. W. 1038, by the Supreme Court, clearly relieves appellee of the charge of contributory negligence as a matter of law. Barron v. Ry. Co., 249 S. W. 825, by the Commission of Appeals; Texas & N. O. Railway Co. v. Crow (Tex. Civ. App.) 300 S. W. 93, opinion of Commission of Appeals in same case, 121 Tex. 346, 48 S.W.(2d) 1106. Affirming the judgment of the Court of Civil Appeals on the issue of contributory negligence, the Dickson and Harris Cases, supra, support the submission in this case of the issue of contributory negligence to the jury. City of Beaumont v. Kane (Tex. Civ. App.) 33 S.W.(2d) 234, involved a delusion, created by lights shining across a river.

The facts reviewed above are sufficient to support the findings of the jury on the particular issues of contributory negligence submitted and also the finding that appellee's injuries were not the result of an unavoidable accident.

■ The finding of the jury that the crossing was not within a town or village must also be affirmed. That issue was sent to the jury by the following question: "Do you find from a preponderance of the evidence that the railroad crossing in question was within a village at the time of the accident in question?"

This question, with the definition of village, was prepared by appellant and submitted by the court at its request. At one time Grayburg had been incorporated. There was no evidence as to the extent of its corporate limits, but we are not intimating that that testimony would have been material. Grayburg was laid out in lots, blocks, and streets, had stores, churches, etc., and was built up very close to the south side of appellant's right of way. The population of the town or village was very small—a few hundred. No houses in the village were on the north side of appellant's railroad tracks. The nearest houses to the track on the north side were in the town of Sour Lake, 700 yards away. Neither party has cited us to any authority defining the exact limits of an unincorporated village. Where the issue is one of fact and the place in issue is not within the inhabited portion of the town or village, the question as to whether or not it is within the village must be left to the jury. Appellee prepared its issue, submitted its definition, and we think, under the circumstances, the finding should be approved.

■ Over the objection of appellant, its claim agent was permitted to give the following testimony, questions and answers reduced to narrative: "My recollection is that this is the third collision at this particular crossing whereby individuals have run into trains. I investigated those. One of the cases came to suit; only one case went to trial; I heard the people testify. I don't recollect what they said, but they said they did not see the train; that was several years ago, prior to this suit. That crossing was about the same then as it is now with about the same conditions surrounding it."

This testimony was properly received. In Missouri, K. & T. R. Railway Co. v. Long (Tex. Civ. App.) 23 S.W.(2d) 401, 403, supra, the court said: "With respect to showing of the happening of other near-accidents at the same place, the Supreme Court of the Unit-

ed States held, in the case of District of Columbia v. Armes, supra, as follows: 'The admission of this testimony is now urged as error, the point of the objection being that it tended to introduce collateral issues and thus mislead the jury from the matter directly in controversy. Were such the case the objection would be tenable, but no dispute was made as to these accidents, no question was raised as to the extent of the injuries received, no point was made upon them, no recovery was sought by reason of them, nor any increase of damages. They were proved simply as circumstances which, with other evidence, tended to show the dangerous character of the sidewalk in its unguarded condition. The frequency of accidents at a particular place would seem to be good evidence of its dangerous character— at least, it is some evidence to that effect.' "

In 10 Encyclopedia of Evidence, 477, it is said: "Other accidents or injuries to other persons at the same crossing are not competent evidence of the defendant's negligence. But such facts have been shown competent as showing the nature of the crossing and as bearing upon the question of contributory negligence." See, also, the Kentucky case of Louisville & N. Railway Co. v. Jackson's Administrator, 250 Ky. 92, 61 S.W.(2d) 1104, and the many authorities therein cited.

But if this testimony was improperly received, under Rule 62a, we would say that the error was immaterial.

■ Appellant complains of certain argument by appellee's counsel. We do not discuss that point because, from the qualifications of the trial court to appellant's bill of exception, it clearly appears that the argument was provoked.

■ Appellant presents the following points of misconduct by the jury: First, it is contended that, before the jury answered any of the questions, it voted that appellee should recover, and then answered all questions to effectuate that agreement. On motion for new trial, eleven of the jurors were offered as witnesses. Juror Cook testified that the jury voted on whether or not the boy had a claim or case, and it was determined that he was entitled to damages by a unanimous vote, and, in answer to questions by attorney for appellant, said that he had no particular thing in mind when he was answering the questions. He further testified, on crossexamination, that the vote was taken merely to determine how the jury felt about the case, and was just a starting point. He said:

"We didn't know how to get at it. To tell the truth, we were all one just about as dumb as another. We didn't know how to begin," that they discussed the other issues previously to the vote, and that they discussed each question separately and voted on it, and that the evidence, pro and con, was discussed in regard to each question—every one of them. And he further testified: "The questions were answered according to the law and the evidence, as I understood it. The evidence was discussed under each particular question. Special Issue No. 4, as to whether permitting the train to stand there was a proximate cause of the collision, was answered no. As to whether that answer was designed to give him damages—well, now in the testimony, the best I remember it, of course, I can't remember all that stuff, there was a little hitch in there somewhere. It was answered that way on account of the evidence; that was true of all the rest of them I think; every one of them were answered in accordance with the evidence and it was not affected by the prior vote to give him damages."

The juror Yawn testified that the first question they voted on was whether or not the plaintiff had a case, and they all voted "Yes," and that such vote was had more to see how they stood, and that they were discussing the first issue in the case; that they read the questions, one at a time, and the first vote was to see whether or not the railroad was negligent, and that it was after they had read over the questions that the vote was taken, and was in the discussion of the first question and the answer to it; that, as to all other questions, they discussed each and every one of them and voted on them as they came along, and answered them according to the evidence, and discussed the evidence pro and con on each question, stating: "As well as I remember, we read the question off, and then we would discuss that before we would vote on it and then we would vote on it, everybody would vote, right down the line. Each question was considered separately; that is absolutely true."

The juror Day testified that they tried one way or another to get started until they finally managed to get started, and that they first decided that the boy was to have pay for his injuries, and that they asked back and forth on all of the questions which way they would go, whether "yes" or "no," and what the evidence was, and what the witnesses said, and all like that. The testimony of the jurors generally raised the issue that they

read and discussed every question, quoting from the testimony of the juror Hendrix, "every one as we came to them. We just took the questions as we came to them." The jurors also testified that they tried to follow the instructions of the court, took the questions in rotation, numerical order, and discussed them as they went along. Thus juror Case testified: "Well, it seems to me like, in deciding the first question, we had to decide whether the boy was entitled to damages or not. That is the way I recollect it now, and that is the thing we decided on and tried to answer that; it was in connection with answering the first question. We read and discussed all the questions thereafter; we didn't omit any of them and go back; we discussed the evidence · on them as we went along."

Question No. 1, referred to by the juror Case and other jurors, read as follows: "Do you find from a preponderance of the evidence that the defendant's allowing the train in question to block the crossing of the public highway constituted negligence upon the occasion in question, under facts, circumstances and conditions existing at the time of the collision involved in this case?"

The jury, by answering certain questions of negligence and proximate cause against the contention of appellee, raised the issue that they were carefully considering their answers to all the questions submitted to them. The following discussion by the Commission of Appeals in Monkey Grip Rubber Co. v. Walton, 122 Tex. 185, 53 S.W.(2d) 770, 772, supports the judgment of the lower court in overruling the motion for new trial, as against this assignment:

"When a case is submitted on special issues, it is the duty of the jury to answer each special issue as the facts justify without regard to the effect of such finding upon the judgment to be thereafter rendered in the cause. Simmonds v. St. Louis, B. & M. Ry. Co. (Tex. Com. App.) 29 S.W.(2d) 989; G. C. & S. F. Ry. Co. v. Harvey (Tex. Com. App.) 276 S. W. 895; Coons v. Culp (Tex. Civ. App.) 278 S. W. 914.

"It is such misconduct as will require a reversal if it be shown that a jury has agreed, in advance of answering the issues submitted, in whose favor the verdict should be, and thereafter attempts to answer the question submitted with a view of bringing about such result. Bradshaw v. Abrams (Tex. Com. App.) 24 S.W.(2d) 372.

"However, the mere agreement by members of a jury during their deliberation as to which party they think is entitled to a verdict is not alone sufficient to constitute reversible error. It must also be shown that the jury has deliberately attempted to make the same effective by framing the answers to the issues submitted in such a way as to accomplish the desired result."

See, also, Debes v. Greenstone (Tex. Civ. App.) 260 S. W. 211; Texas Employers' Ins. Ass'n v. Chocolate Shop (Tex. Civ. App.) 30 S.W.(2d) 416; same case by Commission of Appeals, 44 S.W.(2d) 989; Scottino v. Ledbetter (Tex. Civ. App.) 56 S.W.(2d) 282.

■ The second point is that the juror Halpin gave improper "testimony" to the jury while it was deliberating on its verdict. On the fact issue as to what this juror said, when he said it, and the attending circumstances, we quote as follows from appellant's summary of his evidence, which the trial court had the discretion to accept as true:

"Mr. R. F. Halpin, a witness called by plaintiff, testified as follows: That he was a member of the jury in the case; that the first thing they did when they went to the jury room was to elect a foreman. Question: 'I mean in regard to showing them your hand.' Answer: 'We were practically through with the case, and I was sitting and talking to Mr. Yawn.' Question: 'Mr. Sam Yawn?' Answer: 'Yes, sir, and speaking about the man's injury. I said he is not crippled as bad as I am. I have been making a living about 25 years with my hand. I mentioned that I was crippled for life, something like that. We were not discussing any part of the case, because we had already voted on every issue, you know.'

"On cross examination Mr. Halpin was asked: 'Mr. Halpin, you say you didn't exhibit your hand or arm until after you had voted on all the issues?' Answer: 'I don't know whether all of them or not.' Question: 'How is that?' Answer: 'I don't know whether all of them had been voted on or not. Anyway, we were standing there talking, you know, and the question came up about whether it was a permanent injury or not, and I said I didn't think it was.' Question: 'You really at the time were discussing whether or not he was going to be permanently injured or whether or not he had already gotten over it?' Answer: 'We were just talking after we had voted on the issues, and mentioned about him claiming that he would be bother with his arm.' Question: 'That was the time when you really mentioned it, wasn't it, Mr. Halpin?' Answer: 'No, we were just sitting there talking about it. There

were several of us present. I don't remember every detail because we were going down the line and reading every issue off.' Question: 'At this time you were fixing to take a vote on some of the issues in the case?' Answer: 'I don't know whether it was or not, we were just there waiting for the next one.' Question: 'As a matter of fact, you were saying while it looked like you were entirely over it, you were still suffering from it, is that right?' Answer: 'We had no prejudice toward anybody.' Question: 'You also told them you got hurt at the sawmill?' Answer: 'That was where I got hurt, yes, sir.' Question: 'And that a few days after getting hurt you were still sick and you signed some kind of paper?' Answer: 'We talked about how it happened, and I told them I signed a paper and that it was a release: However, the mill company paid me straight time on it over a year, and I got my job back, and I was not sore. We were just talking among ourselves.' Question: 'Did you tell them you signed some papers when you hardly knew what you were doing?' Answer: 'Yes, sir.' Question: 'And you thought you were only drawing at that time your time?' Answer: 'My expense check.' Question: 'As a matter of fact, you later found out you had settled the case by signing that paper?' Answer: 'Yes, sir.' Question: 'How is that?' Answer: 'Yes, sir, we were not voting on any issue at that time when we were talking about that. We were just sitting in the chairs talking to ourselves.' Question: 'You also stated that you were still suffering from your hurt?' Answer: 'Yes, sir.' Question: 'Though it had been several years ago?' Answer: 'Yes.' The witness further stated that nothing was said about plaintiff at all.

"On re-direct examination witness was asked: 'Was that before or after the issue of damages had been voted on?' To which he answered: 'That was after the issue of damages had been voted on. I am pretty sure it was after it had been voted on.'

"On re-cross examination Mr. Halpin was asked this question: 'Do you mean that was after the vote was taken that would allow him to recover damages?' Answer: 'After they passed on that part.' Question: 'After they passed the part that would give him damages?' Answer: 'Yes, sir, I am not sure of that, but I am pretty sure. I cannot recall everything.' Question: 'As a matter of fact, Mr. Halpin, isn't this correct, that you were discussing the incident of his injury as to whether or not the injury would be permanent or whether he was over it?' Answer: 'I don't remember exactly. We were just talking, you know, about my occurrence, you know. We just didn't figure that would have any bearing on the case, so far as that is concerned. They just happened to notice me being crippled, you know.' "

On the issue as to the effect of Halpin's statement, the juror Yawn testified: " 'Do you think that affected you, hadn't you already made up your mind about the case?' Answer: 'Well, I had almost, it was after we had voted that he had a case.' That they had made up their minds they were going to give him more damages. Question: 'You didn't hear what he said about it, did you?' Answer: 'Well, I heard it all right. I heard what he said, yes, sir, I did. Really, it might have had a little weight about it. I couldn't say.' Question: 'Weight on what?' Answer: 'I don't know that I had my mind made up thoroughly.' "

The statement made by the juror Halpin was improper. In Galveston, H. & S. A. Railway Co. v. Brassell (Tex. Civ. App.) 173 S. W. 522, 524, during the deliberations of the jury, one of them exhibited his leg to show the effect of an injury and another narrated his experiences with sciatica, etc. Discussing the effect of these statements, on appeal, the court said: "It cannot be imagined that the two jurors who had sciatica would have been allowed to testify in the courtroom as to how it affected them and show the effects of it on their limbs, and yet that is what they did in the privacy of the jury room."

In this case all the jurors except juror Yawn testified that Halpin's statement did not affect them, but, as held by the Supreme Court in Moore v. Ivey, 277 S. W. 106, these declarations of jurors that they were not influenced by the extraneous matters are entitled to very little weight, in passing upon the question as to whether the verdict of the jury was affected thereby. Where misconduct is shown, the rule is that it must appear beyond a reasonable doubt that the misconduct did not influence the verdict to the prejudice of the complaining party. Casstevens v. Ry. Co., 119 Tex. 456, 32 S.W.(2d) 637, 73 A. L. R. 89, and the many authorities therein cited and reviewed. As the statement complained of was improper, the inquiry is whether or not it reasonably appears from the record that it did not influence the verdict against the interests of appellant.

■ The evidence of the jurors raised the following fact issues which the law resolves in support of the judgment: (a) The statement was not made until all questions submit-

ting appellant's negligence had been answered by the jury against appellant's contention. (b) The statement was made while the jury was discussing the amount of damages to be found in answer to the questions submitting that issue. (c) The statement could not have affected the jury in their answers to the issues of contributory negligence nor their finding that the crossing was not in a town or village; this conclusion follows because the statement had no relation whatever to these issues and there is not a suggestion in the testimony of any of the jurors that it was considered by them in connection with these issues. (d) In construing the testimony of the juror Yawn that the statement "might have had a little weight" on him, the trial court was justified in concluding that the "little weight" was in reference to the amount of appellee's recovery. The final and determinative issue is whether or not the statement improperly affected the jury's verdict in fixing the amount of appellee's damages. The following summary of the facts taken from appellee's brief convinces us beyond a reasonable doubt that the statement of the juror did not prejudice appellant on the issue as to the amount of damages:

"It is interesting to note that the jury, in estimating the damages for the plaintiff, placed it at the odd figure of $1,060.00, which appellee contends is the minimum amount that they could possibly have found a verdict in favor of the plaintiff, under the undisputed evidence of the case, and appellant does not attack the verdict as excessive in any manner. Both Otis Richmond, and his father, B. O. Richmond, testified that he was incapacitated, after the accident, for a period of four months. This evidence was undisputed. Otis Richmond testified that the amount he got as wages was $8.00 a day. Four months, or one hundred twenty days, at $8.00 a day would give $960.00.

"Otis Richmond further testified that he had other injuries, a cut over the eye, with a scar that remains, and was visible at the time; a scar in the middle of his forehead, bruises on both of his legs, and a cut on the chin. This statement was also undisputed. He expended $20.00 for doctors' service. Using the hypothesis, therefore, that the jury gave him full time for the time he was out, or $960.00, they, therefore, allowed him $100.00 for two permanent scars and his pain and suffering in the case, and his expenses. Surely the verdict of the jury was the minimum that they could possibly have arrived at under the undisputed evidence in the case, and,

more than any other fact, shows that the jury were either uninfluenced by the statement of Mr. Halpin or were influenced by it, in favor of appellant, to find that the boy's injury was not permanent, and that he should be given no damages based upon a permanent injury. This was, in fact, the object of Mr. Halpin's argument, who stated:

" 'The question came up about whether it was a permanent injury or not, and I said I didn't think it was.'

"There can hardly be any doubt that from the finding of the jury, they 'didn't think it was,' or they would have allowed a much larger sum as his damages. As the evident effect of the actions and the statement of Mr. Halpin was to lower the amount of the damages, it was favorable to the appellant, and certainly could not be the basis of a motion for new trial on their behalf."

The holding of the Commission of Appeals in St. Louis, B. & M. Ry. Co. v. Cole, 14 S.W. (2d) 1024, 1025, supports our conclusion. It was there said: "With reference to the third ground of misconduct, one of the jurors testified that it was mentioned in the jury room that, if the jury gave too much, the 'railway company will appeal it and it will lay in the appeal court for quite a while.' Another juror testified that he thought some one made the remark: 'Now, if you won't make it too big the railway company will pay off and not appeal it.' This seems to be all that occurred with reference to a discussion along this line. It was disclosed that at the time this discussion took place the various jurors favored amounts from $35,000 to $65,000, a majority of the jury favoring a verdict substantially larger than that which was afterwards agreed upon. It seems that this improper argument was effectively used by jurors who favored a much smaller verdict than the remaining jurors in order to cause such jurors to agree to a smaller amount. These remarks were reasonably calculated to, and it appears did, bring about a reduction in the amount of the verdict that would otherwise have been rendered. While it was undoubtedly improper for the jury to discuss the question as to whether an appeal would be taken in considering the amount of the verdict, yet it appearing that such action brought about a lesser verdict than would otherwise have been rendered, plaintiff in error is in no position to complain. A verdict of a jury should not be set aside when an error has been committed, if it reasonably appears that such error operated beneficially to the party complaining."

In reaching this conclusion, we are not overlooking certain testimony by the jurors to the effect that, while discussing appellee's damages, some of them thought he was entitled only to "half pay" for his lost time. That theory of the case was contrary to the court's charge, and therefore no inference can arise that Halpin's statement prejudicially induced the jurors to construe the facts as the court had directed.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

COMBS, J., not sitting.