## TEXAS & N. O. R. CO. v. DAVIS.
### No. 4475.

Court of Civil Appeals of Texas. Beaumont.
March 25, 1948.
Rehearing Denied April 14, 1948.

Cecil & Keith, of Beaumont, for appellant.

John L. Bell, of Beaumont, for appellee.

WALKER, Justice.

E. H. Davis brought this action against the Texas & New Orleans Railroad Company to recover damages for injuries to his person and to his automobile, resulting from a collision between his automobile and the Railroad Company's train of cars at the point where one of the Railroad Company's tracks crosses over the Beaumont-Port Arthur Highway. Gulf Insurance Company intervened and claimed subrogation to plaintiff's cause of action, to the extent of payments made by them under a policy of theirs insuring plaintiff against such losses.

E. H. Davis is referred to hereinafter as plaintiff, and the Texas & New Orleans Railroad Company, as defendant.

The collision occurred during the darkness of the early morning hours of May 26, 1944, while the crossing was completely occupied by defendant's cars, and only the cars were there to warn plaintiff that the crossing was occupied and the road was blocked. Plaintiff alleged that the night was very dark, that visibility was obscured by rain and by vapors from industrial plants adjacent to this crossing, that defendant's cars were still further obscured by their dark color, which did not reflect light well and which blended with the night and with the dark color of the road pavement, that under the circumstances the cars upon the crossing were not adequate warning that the crossing was occupied, that similar conditions had prevailed at other times, causing injuries to various travelers upon the road and very nearly causing injuries to other travelers, that under such circumstances the crossing was unusually hazardous to night time traffic upon this highway, of which defendant knew or should have known, and that defendant was negligent in failing to illuminate the crossing or to give warning by flares or various illuminated devices that the crossing was occupied by the cars.

Defendant, in addition to exceptions and a general denial, specially plead that plaintiff was guilty of contributory negli-

gence in various respects, and in the alternative, that plaintiff's injuries resulted from an unavoidable accident or from some "new and independent cause."

The action was tried to a jury and upon the close of the evidence defendant moved for an instructed verdict. This motion was overruled, and the jury found, in response to various special issues, that when the collision occurred: (1) The Railroad crossing was more than ordinarily dangerous as a night time crossing, and defendant knew this fact; and (2) defendant was negligent in the following respects, each a proximate cause of the collision, to-wit, in failing to have a lighted flare stationed on the ground at said crossing, and in failing to maintain a lighted mechanical device or signal at said crossing. They assessed plaintiff's damages at $1500 for the injuries to his person and at $1275 for the injury to his automobile. They acquitted plaintiff of contributory negligence in the respects submitted to them, finding that plaintiff did not fail to keep a proper lookout for defendant's cars, that he was not driving his automobile at an excessive speed, that he was not negligent in failing to apply his brakes in time to avoid the collision, or "in driving his automobile immediately prior to the collision—at such a—speed that he could not stop the same within the range of his headlights," or in failing to turn his automobile to the right immediately prior to the collision, and that he did not fail to have his automobile under proper control. They found further, that the collision was not the result of an unavoidable accident and that it "was not solely the result of a new and independent cause."

Defendant moved for judgment non obstante veredicto, but the trial court overruled this motion and entered judgment upon the verdict, that plaintiff recover of defendant the sums referred to above, and by agreement, an additional sum for certain expenses, the whole totaling $3,288. The judgment also established the rights of intervenor. From this judgment defendant took this appeal.

Defendant's Points of Error raise for our consideration the questions, (1) whether defendant was proved to be negligent, and (2) whether plaintiff was guilty of contributory negligence as a matter of law.

There is evidence tending to prove the following matters:

The collision occurred while plaintiff was driving his automobile north from Port Arthur to Beaumont. He was severely injured. He struck the rear wheel trucks of an oil tank car, derailed these trucks, and wrecked his automobile.

There was some evidence that defendant's train was stopped at the time of the collision and some evidence that it was moving slowly. At any rate, it moved to the east and cleared the crossing very shortly after the collision, and there is some indication that defendant's train crew did not discover the fact of the collision until the derailed trucks began to follow the rails of a line branching off from that along which defendant's train was proceeding.

The collision occurred where defendant's track crosses the highway between Beaumont and Port Arthur. This highway was very heavily travelled. It was not only the principal means of communication by road between these two populous cities, but substantially all of the highway traffic out of Beaumont to the towns of Nederland, Port Neches and to several large industrial plants in the vicinity of those towns proceeded along this road, over defendant's crossing, to the point known as Broussard's Curve, where the road divided, one branch continuing on as a two lane highway to Port Arthur and the other branch leading to the industrial area to which we have referred.

However, there was little traffic upon this road when the accident occurred.

The highway ran North from Broussard's Curve to the city limits of Beaumont, and throughout this distance it was paved and the pavement carried four traffic lanes, divided by a narrow esplanade in the center of the pavement. Defendant's track crossed this road at an angle not quite a right angle, along a line running from a little South of West to a little North of East. (Although there is no pronounced curve, plaintiff thought that he would have run into the train if he had turned his car to the left.) The crossing lay between Brous-

sard's Curve and the City. It was about a mile South of the City and a greater distance, variously estimated by the witnesses at a mile and a quarter or something more, North of the Curve.

The crossing was at grade and the way across it was level with the road surface. That part of the highway which automobile traffic could use at the railroad crossing was 58 feet wide, and it must have been about this width from the crossing to Broussard's Curve. Each of the four traffic lanes was 10 feet wide, and the esplanade, which was rounded over and could easily be crossed by an automobile, was 6 feet wide. A hard surfaced shoulder, 6 feet wide, lay on either side of the pavement.

The road was straight from Broussard's Curve to the crossing, and it was almost flat from a point about 7/8ths of a mile (plaintiff's estimate) to the crossing. The Curve itself was only 75 hundredths of a foot higher than the crossing, but the road from the Curve gradually ascended to the high point just referred to and ran thence down a very gentle and almost unnoticeable decline to the crossing itself, which was 6.45 feet lower than the high point mentioned. Thus the road descended 6.45 feet in a distance of about 7/8ths of a mile.

There was nothing on or adjacent to the highway which could have obscured plaintiff's view of the crossing, or distracted his attention. The country adjacent to the road was level. Under ordinary conditions of visibility, the crossing was not hazardous.

There was evidence that each side of this crossing was marked by a standard railroad warning sign, consisting of cross arms at the top of a post, the whole being perhaps 12 or 13 feet high, one sign being on plaintiff's side of the road as plaintiff approached the crossing, and there was also some evidence that the Highway Department maintained another railroad warning sign about 500 feet from the crossing, on plaintiff's side of the road and the track as he approached the crossing. It was also in evidence that each sign carried reflectorized buttons. However, neither plaintiff nor the witness Deason, who was driving a short distance behind plaintiff, saw these signs; and plaintiff and another witness said that

both of the cross arm signals were North of the track, where plaintiff probably could not have seen them.

No other signs or signals giving warning of the existence of the crossing or of its occupancy by the train plaintiff collided with were in existence.

Plaintiff left Port Arthur about 3:30 A.M. It was dark and a light drizzling rain was falling at the time and continued to fall throughout the period before the collision. Plaintiff said that there was no fog but that there was "the usual haze incident to a rain of that type." This is about the substance of Deason's description of the weather. There was little traffic on the road, and plaintiff drove at a steady speed of about 45 miles per hour until he came up behind the automobile driven by the witness Deason. Plaintiff followed Deason for a short while, but Deason did not maintain a steady speed and whenever plaintiff approached him his car threw mud upon plaintiff's windshield, and for these reasons plaintiff increased the speed of his automobile and passed by Deason. Plaintiff said that this occurred just after he rounded Broussard's Curve, which, as we have stated, was over a mile distant from the crossing. Deason, however, testified that it occurred much nearer the crossing; he once estimated the distance from the crossing at about 200 yards, although this was evidently a rough estimate. Plaintiff moved to the lane next the esplanade to pass Deason, and he continued in this lane on down to the crossing. He testified that he increased his speed to about 48 or perhaps to 50 miles per hour while passing Deason, and maintained this increased speed until he thought he was far enough ahead of Deason to prevent his wheels throwing mud upon Deason (perhaps 100 yards) and that he then decreased his speed to about 43 to 45 miles per hour. Deason's testimony accords with this, in substance (he thought plaintiff slowed his automobile very little, if at all, after passing him).

Plaintiff saw no other vehicle upon the highway after moving ahead of Deason.

Plaintiff said that he did not see defendant's car until he was within 80 or 90 feet of it, when it suddenly and unexpectedly

materialized before him. (Defendant's witnesses testified to finding skidmarks on the road 120 feet long, indicating that plaintiff under-estimated the distance at which he perceived the train.) He made no effort to turn his automobile. He applied his brakes immediately upon seeing the train, but without any effect except to reduce the speed of his automobile. He continued straight on and struck defendant's car at a speed which he estimated at about 20 miles per hour. His automobile was a 1942 model Buick (type not stated), and plaintiff described it as a heavy automobile. We have referred to the physical results of the collision.

Plaintiff offered some explanation for not turning his automobile. He said he thought there was a ditch on his right and that he would run into the train if he turned to the left.

Plaintiff said that his lights were burning brightly, that he was awake and alert and was looking straight ahead down the road, and that his windshield wiper was operating efficiently and provided him with an arc through which he could see the road. The highway and crossing were not illuminated by any source of light other than plaintiff's headlamps.

Plaintiff testified that his automobile was in excellent condition and that brakes, lights and windshield wiper were functioning properly. Plaintiff had had the lights elevated slightly to provide a greater range of vision at night.

The evidence does not show the distance to which plaintiff's headlamps would penetrate at night; the range of vision, according to plaintiff, depended to some extent upon how well an object reflected light. Nor is there any evidence showing within what distance plaintiff could stop his automobile at any speed mentioned by him.

Oil tank cars were shown to be large. Trevey described them as being 38 feet long and 12½ feet high, from rail to top of dome. He said the standard tank was 8 feet in diameter. Other witnesses gave substantially similar testimony.

Plaintiff was an experienced driver. He was an insurance salesman, and for many years his work had required him to go from Beaumont to towns in Tyler and Jasper Counties and to Port Arthur, and he was accustomed to making these trips in his automobile. He spent some days each week away from Beaumont, and very often returned to his home in Beaumont after nightfall.

Plaintiff had traveled over the Port Arthur highway weekly for some thirteen years before the collision with defendant's train, traveling both at night and during the day, and he was thoroughly familiar with the crossing. He had actually passed over it in safety three times during the day preceding the collision.

Plaintiff did not have the existence of the crossing in mind as he approached the crossing from Broussard's Curve, although he knew, of course, that the crossing existed. He said that he did not see either of the signs referred to above, the cross arm signal or the highway signal, but it is quite clear from his testimony that he would not have reduced his speed had he observed these signs. Plaintiff's testimony shows that he customarily relied upon other matters to warn him of the *presence of a train* upon a crossing, either this or another crossing.

He said that during the many years he had been driving over this highway, he had never seen a train upon the crossing and that he had not expected to see one.

Plaintiff was 56 years old at the time of the collision, and was returning to his home after a very long and busy day. He had arisen at 7:30 or 8:00 A.M. on May 25th, some 20 or 21 hours before the collision, and after a short stay at his office, he had driven his automobile to Port Arthur. From thence, in company of some friends, he had driven his automobile to Houston, via Beaumont, and had subsequently returned to Port Arthur from Houston, leaving Houston about 10:30 P.M. of the 25th, and arriving in Port Arthur between 2:30 A.M. and 3:00 A.M. on the 26th. All of these trips were made over the Highway and over the particular crossing involved in this suit.

Plaintiff doubtless could have stopped in time had he been driving at a slower speed. Trevey stopped; he estimated his speed

at 30 miles per hour and thought he perceived a train when about 50 feet distant from it. His automobile was a 1941 Chevrolet Coupe. Wood turned off the road the first time he almost collided with a train, but stopped on the second occasion. He estimated his speed on each occasion at 35 miles per hour. He estimated that he came within 50 to 60 feet of the train the first time before he saw it, and that he saw it on the second occasion when about 80 feet away from it. Plaintiff himself thought that he could have stopped had he only been driving 30 miles per hour.

Defendant's track was a branch line, running from its Sabine Sub-division west of the highway to the Magnolia Refinery plants (two plants are referred to, at varying distances from the highway) and other industrial plants east of the road. It carried no regularly scheduled runs. The volume of traffic over this track cannot be accurately estimated, but it seems not to have been large. Trevey, who began to travel regularly over this highway in November, 1943, on his way to and from work, said that he had seen trains upon this track about once a week, sometimes during the day and sometimes at night. Wood apparently saw them there more often. The needs of the plants served by this track determined the volume of traffic across the highway.

There was evidence that fumes and vapors from the industrial plants east of the road sometimes affected visibility at this crossing, but there is no direct evidence that such fumes and vapors were present at the crossing when plaintiff collided with the train. Defendant introduced a weather report which indicated that the winds prevailing at that time would have driven these fumes and vapors away from the crossing.

We have referred to the fact that plaintiff struck an oil tank car. Trevey said that he had never seen another kind of car upon this track, and plaintiff observed no other type. However, Deason said there were other types of cars in the train with which plaintiff collided.

It was in evidence that the oil tank cars upon the crossing, and that oil tank cars generally were of a dark color, and that a careful driver would have difficulty perceiving these cars at this crossing on a dark night, and especially when the pavement of the road was wet. The crossing was level. The cars upon the crossing were of a black or dark color which did not reflect light well; and the surface of the road when wet was of about the same color as the cars upon the crossing. The resulting lack of any contrast between tank car and pavement, added to the absorption of light by the color of the cars and to the absence of any source of illumination other than automobile headlamps tended at night to conceal a tank car upon the crossing from the driver of an approaching automobile until the automobile was rather near the car, and then the tank car, suddenly and without warning, materialized before the driver in a fashion calculated to startle him. These conditions obtained at the time of plaintiff's collision. Plaintiff said that he could not perceive any difference between the color of the car and of the road, and that he would have seen the oil tank cars if they had been of another color. The following testimony of the witness Hugh Wood shows how all of these factors (darkness of the night, of the car, and of the pavement) operated to conceal the presence of the car upon the crossing from the driver of an approaching automobile. Wood said that during the latter part of January or the first part of February, 1944 (shortly before plaintiff's collision), he was driving his automobile along this highway toward this crossing at about 12:30 at night. The night was very dark. His automobile headlamps were functioning properly and he was moving at a speed of about 35 miles per hour, which was his customary speed. He knew of the existence of the crossing and was familiar with it, having passed over it many times before. He testified:

"I was coming in about 12:30 at night, approached this intersection without any particular thought being given to watching out for cars, just watching the road ahead, as you would do in driving (this description would apply to plaintiff's conduct); and suddenly these cars loomed up in front of me, without any signal or warning of any

kind that the crossing was already occupied. I figured I was too close to them to stop without hitting, so I turned in that little road that goes over to the Jefferson Packing Company and came to a stop about 20 or 30 feet off the pavement.

"Q. If you had not turned, would you have hit that train? A. I was afraid I would have. I went far enough to have hit it if I didn't stop quicker going straight than I did after I turned."

He said that he was within 50 or 60 feet of the train before he discovered its presence and then testified:

"Q. Do you have any particular reason why you didn't see the train before that? A. There wasn't any evidence of a train being there. It didn't reflect any light; wasn't anything to show you that the crossing was there."

And further:

"Q. Did you get any reflection to the beam from your lights when they hit those tank cars? A. Not until I was within 50 or 60 feet of them.

"Q. Were there any lights on the other side of the train that you could see anywhere? A. No, there was not.

"Q. Were there any lights around the train or on the ground near the train? A. No.

"Q. Did you have a similar experience going the other direction (toward Port Arthur)? A. Yes, sir, I did.

"Q. Was that or not after this? A. I would say two or three months afterwards."

Thus his second experience would have fallen about when plaintiff ran into the train. The witness Trevey said that it was difficult to see these tank cars under conditions such as those surrounding plaintiff, and then testified:

"Q. Why is it you say it is difficult to see it? A. Well, there is no reflection of your headlights on the cars, the train of car, whatsoever.

"Q. Those oil tanks, do your lights seem to penetrate those oil tanks on a dark night? A. Yes, sir.

"Q. Do you get any sheen or reflection from them? A. Very little; no, sir.

"Q. When I use the word 'penetrate' I mean do they show them up? A. No, sir."

Trevey had almost collided with a train of tank cars during January, 1944, on a dark night, and like Wood, he knew the crossing was there. He approached to within 50 feet before perceiving the cars. This was the only experience of the sort he had had, but on another occasion he drove up behind a stopped automobile to within 60 or 75 feet of the track before perceiving the cars. He was referring to oil tank cars. Wood had "occasionally" had the experience of driving up behind stopped automobiles before perceiving the train on the track. He testified:

"Q. Have you ever had any experience of the man ahead of you pulling up and stopping at the crossing for a train, and you not see the tank car until you got right up to it? A. That's right, I have.

"Q. Did that happen frequently or not? A. No, not frequently; occasionally it does."

There were no lights of any character at or about the crossing, and the crossing was not illuminated by any light except that of approaching automobiles. This was true on the occasion in question; such light as the locomotive may have cast was not seen by plaintiff, and the evidence explains why; plaintiff struck the 23rd car from the engine.

There was some other evidence that oil tank cars upon this crossing could not be as quickly perceived under automobile headlamps as other objects (and thus, as quickly as a prudent automobile driver would expect to be able to observe them). We have referred to Trevey and Wood having seen stopped automobiles in the road before they were able to perceive the cars blocking the road. Trevey's testimony describing the occasion in January, 1944, when he almost collided with defendant's cars, indicates that his automobile headlamps revealed defendant's crossing marker before revealing the cars on the track.

There was also evidence that on other nights these oil tank cars afforded adequate notice of their presence. Wood (plaintiff's witness) testified·

"Q. Have you had any other experience with reference to encountering these tank cars at night? A. Yes, I have seen them on there numbers of times, would see them far enough ahead, in that I wouldn't get up close to them, or there would be somebody between me and the cars already stopped."

And the references to stopped automobiles is some indication in this direction.

Other than matters hereinbefore stated, the following is the only evidence rending to show that defendant either knew or should have known of any unreasonable risk of harm attending defendant's night time use of this crossing: The witness Hickman testified that during a period of some 9 years, he had served as a deputy sheriff, assigned to patrol duties from 5 P. M. until 5 A. M. He left the Sheriff's office and took other employment on June 4, 1945, subsequent to the date of plaintiff's collision (which he had investigated immediately upon its occurrence) and his work as a night time patrol officer thus covered a period of some 7 or 8 years prior to plaintiff's collision. Mr. Hickman testified that while he was on patrol duty, he had several "calls" to that crossing before plaintiff's collision occurred, that some of these "calls" were during the night time, when a drizzle or light rain was falling, that some of these "calls" were made with reference to an automobile having collided with an oil tank car on that crossing. He said that he recalled "accidents" there prior to plaintiff's that involved collisions during the rain, and that all of the "accidents" he answered were at night. He said that since the 4-lane highway had been put down there, with the 4 lanes out to Broussard's Curve, there had not been any change in the highway, nor any change with reference to the way the spur track crosses the highway out there. He said that visibility of the crossing was the same when approached from either direction. He testified:

"Q. Getting back to the calls which you say you answered at that crossing on rainy nights, prior to the time you answered that call on (plaintiff), can you tell us approximately how many of those calls you had and when they were? A. I have answered several calls there, and I don't know, couldn't recall the date on the ones I have answered there."

And further, "I know it was several. I don't know just how many." He said that he got those calls over a period of 8 or 9 years, that he would say he had as many as one a year, and that he believed that he had had as many as one every six months but would not be positive about that. He testified that he would say the four lane highway was put down 4 or 5 or 6 years before plaintiff's wreck (the resident State Highway Engineer testified that this highway was completed and accepted by the State during September, 1939, which was about 4½ years before plaintiff's collision). He testified further:

"Q. Now from that time did you have as many as one call each six months continuously up to the time you left? A. Yes, sir.

"Q. And were those calls on rainy nights? A. Both kinds; rainy and clear nights.

"Q. What percentage of the calls would you say were on dark, rainy nights? A. I would say 90% of them."

He said that during the war years (and plaintiff's collision occurred during those years) traffic over this particular highway had increased about 75%, and was heavy.

There was evidence from which the jury could have inferred that defendant could always have given adequate warning at night of the presence of trains upon this crossing, at very little trouble and expense to defendant. Various witnesses testified to having seen fuses used at this crossing, at night and sometimes under conditions worse than those existing when plaintiff was hurt. These fuses were small flares, easily carried, ignited and used, and when lighted, could be seen at great distances. Trevey said that such a flare could be seen at a distance of a half a mile, on a dark and rainy night. Wood estimated the distance at 400 to 500 feet, and perhaps more. Plaintiff said that he had seen the glow from such a fusee on a dark and rainy

night while he was yet at Broussard's Curve, approaching the crossing, and that when he reached the top of the high point about ⅞ths of a mile from the crossing, he could see the burning fusee itself. Defendant's train crew which operated the train into which plaintiff ran numbered six men, an engineer and fireman in the locomotive pulling the train, a train foreman, two brakemen and a hose coupler. None of the crew operating the train with which defendant collided appeared and testified.

We have referred to the heavy traffic over this highway. Defendant had in force no rule governing the use of this crossing, except the statutory whistle signal as the train approached.

■ A. (1) We hold, upon the grounds now to be stated, that the evidence raises the issue that defendant was under a duty to give plaintiff other notice of the presence of the cars upon the crossing than was afforded by the cars alone. Defendant admittedly gave no such additional notice, and thus there is evidence of negligence on defendant's part.

■ (2) Whether defendant was under the duty of giving additional notice of the cars is to be determined by the rule expressed in the following quotation from this court's opinion in Texas & N. O. R. Co. v. Adams, Tex.Civ.App., 27 S.W.2d 331: "The duty to furnish additional signals, gates, or warnings of the presence of trains across a highway arises only when the operatives of the train could reasonably have assumed that, due to the peculiar condition, the lawful presence of the train across the highway was not sufficient to warn travelers approaching the crossing in a careful manner." 27 S.W.2d at page 334.

Such a rule, namely, that defendant must give additional warning that cars are upon the crossing when the cars alone will not give adequate notice of their presence to the prudent traveler upon the blocked highway, is an absolutely necessary consequence of defendant's act in moving cars upon the crossing. For having blocked the traveler's way in order to serve defendant's private purposes, at a time selected by defendant

without advance notice to the traveler, and having thus created a situation potentially dangerous to the traveler's life and property, defendant must be under a common law duty to give the traveler reasonable notice of the cars if the cars themselves will not convey the adequate warning of their presence which they usually do convey. The Commission of Appeals, in effect, adopted such a rule on the first appeal of Missouri, K. & T. R. Co. v. Long, Tex.Com. App., 299 S.W. 854, which applied to the hazard incidental to the blocking of a highway the rule adopted in Missouri, K. & T. R. Co. v. Magee, 92 Tex. 616, 50 S.W. 1013, concerning the hazard incidental to a train of cars approaching a road crossing. The Commission said: "That, if that particular place was so peculiarly dangerous that prudent persons could not use the public road in safety, unless the company employed a flagman or other extraordinary means to signal the approach of their trains, then, in such event, it was incumbent upon them to employ such extraordinary means." The rule expressed in the Adams case seems to be the basis of the decisions in Missouri, K. & T. R. Co. v. Long, Tex. Civ.App., 23 S.W.2d 401, previous appeal at Tex.Civ.App., 293 S.W. 184; Tex.Com. App., 299 S.W. 854; Beaumont, S. L. & W. R. Co. v. Richmond, Tex.Civ.App., 78 S.W. 2d 232; Beaumont, S. L. & W. R. Co. v. Cluck, Tex.Civ.App., 95 S.W.2d 1033; St. Louis, B. & M. R. Co. v. Brack, Tex.Civ. App., 102 S.W.2d 261; and Gulf, C. & S. F. R. Co. v. Picard, Tex.Civ.App., 147 S.W. 2d 303. See also: Orange & N. W. R. Co. v. Harris, Tex.Civ.App., 57 S.W.2d 931, at page 936, dissent on other grounds at 59 S.W.2d 217, which was sustained and cause remanded to the trial court, at 127 Tex. 13, 89 S.W.2d 973, leaving in force this court's conclusion that the evidence raised the issue of negligence in failing to provide someone to warn approaching travelers of the flat cars across the street. We think that the terms "illusion," "distraction," "trap," and the like, when used to describe situations like those considered in the decisions just cited, are but convenient short-hand descriptions of the peculiar facts before the court; the only

principle indicated by such terms is that which we have stated.

■ Of course, the temporary character of the unusual hazard to approaching travelers was no defense to this action (although it seems relevant on the question, whether defendant had or should be charged with notice of the hazard involved here). See: Tisdale v. Panhandle & S. F. R. Co., 228 S.W. 113, 16 A.L.R. 1264, in addition to the decisions just cited.

(3) However, in determining whether the quoted rule required of defendant additional warning that cars were upon the crossing, these additional rules must be kept in mind:

■ a. Defendant had the right to assume, *in the absence of notice to the contrary,* that approaching travelers would gauge their speed according to the efficiency of their automobile headlamps and other equipment and according to existing apparent natural conditions, especially those affecting visibility of the road, such as darkness, rain and fog; and that despite lowered visibility from such natural agencies, due care by the approaching traveler would prevent a collision with defendant's cars without other notice of the presence of the cars than that afforded by the cars alone. Acting upon this view, the courts of this state have often denied relief to travelers injured in nighttime collisions of their vehicles with railroad cars blocking their way over road crossings, sometimes upon the conclusion that the operator of the cars was not negligent in failing to give additional warning of the cars and sometimes upon the conclusion that the operator's conduct was not a proximate cause of the traveler's injury. The risk of harm to the traveler from the blocking of the highway by the cars upon the crossing was treated as a reasonable incident of a lawful act, which could have been avoided by due care upon the traveler's part and against which the traveler was therefore required to protect himself. See: Texas & N. O. R. Co. v. Stratton, Tex.Civ.App., 74 S.W.2d 741; Texas & N. O. R. Co. v. Stratton, Tex.Civ.App., 74 S.W.2d 746; Kypfer v. Texas & P. R. Co., Tex.Civ.App., 88 S.W.2d 528; Texas & N. O. R. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113; Walker v. Texas & N. O. R. Co., Tex.Civ. App., 150 S.W.2d 853; Texas City Terminal R. Co. v. Allen, Tex.Civ.App., 181 S.W. 2d 727; Wichita Valley R. Co. v. Fite, Tex. Civ.App., 78 S.W.2d 714.

■ b. Defendant, of course, must have had, or been charged with, notice of the factors which made necessary the additional warning of the presence of the cars upon the crossing. However, under the decisions just cited, and perhaps under the evidence that these cars sometimes gave adequate warning at night of their presence on the crossing, proof of the illusion which mislead plaintiff and of the circumstances which created that illusion is simply not enough to support a finding that defendant either knew or should have know that such an illusion would result from such circumstances. Consequently if plaintiff was to make out a cause of action against defendant, he had the burden of proving, by some form of notice other than the aforesaid circumstances, that it ought to have been known by defendant that this illusion would occur when this combination of circumstances occurred. What effect such proof of other notice would have upon defendant's liability is not a matter adjudicated in any of the decisions referred to immediately above. Notice other than that given by the prevailing conditions was not before the courts in those cases and we distinguish those cases from this on that ground.

■ (4) When the evidence is considered with these rules in mind, the crucial question appears to be one of notice to defendant of the hazard causing plaintiff's collision. The proof shows that *under the combination of circumstances* related in our statement of evidence, the presence of oil tank cars upon the crossing is attended with an unreasonable risk of harm to an approaching traveler, because the cars may be concealed from the traveler's view until he approaches so near the cars that he may not be able, in the exercise of due care, to avoid colliding with them. A temporary illusion occurs, tending to

create the belief that the highway is open. The cars alone do not, under these circumstances, give adequate warning of their presence, and if defendant knew or in the exercise of due care should have known of this fact when plaintiff approached the train, then defendant owed plaintiff the duty of giving additional warning that the cars were blocking plaintiff's way.

(5) We may now consider the proof of such notice.

Without the testimony of Hickman, the proof of such notice is insufficient. Defendant was moving the cars at an hour when there was little traffic on the highway. It was not shown that vapors from industrial plants were present upon the crossing. For reasons heretofore stated, the night, the dark color of the cars and pavement, the mist and rain, did not put defendant on notice of the particular hazard under consideration. The experiences of Trevey and Wood happened not long before plaintiff's collision occurred, apparently without attendant publicity, and revealed only passing conditions; it ought not to be inferred either that defendant knew or should have known of these incidents.

However, Hickman's testimony constitutes prima facie proof sufficient to charge defendant with notice, prior to the occurrence of plaintiff's collision, that when oil tank cars were upon this crossing under the circumstances hereinbefore related, additional warning ought to be given approaching motorists that the highway was blocked by these cars.

■ Hickman said, in effect, that before plaintiff collided with defendant's train, other motorists had collided with oil tank cars on this very crossing under conditions substantially like those existing when plaintiff's collision occurred. Prior events of this sort ought to require, and we hold that they do require of defendant that defendant make some effort to determine why these collisions had happened; and for all this record shows, such an investigation would have revealed to defendant the existence of the hazard—the occurrence of the illusion —which caused plaintiff's injuries. After all, defendant need only have made inquiry of the persons involved in the collision; and when the great volume of traffic over this crossing and the consequences of inadequate warning to the approaching motorist are considered (serious injury or even death, or damage to, or destruction of his automobile), there is nothing unreasonable in requiring defendant to make such an investigation as we have indicated. Proof of such investigations, and the results thereof, was before this court in Beaumont S. L. & W. R. Co. v. Richmond, Tex.Civ.App., 78 S.W.2d 232. Any possible inferences of contributory negligence on the part of the motorists involved in these collisions is rebutted prima facie) by the number and regular occurrances of these other collisions over a period of some 5 years prior to plaintiff's collision; these circumstances indicate that the illusion causing plaintiff's collision was a cause of these earlier collisions, and distinguish this case from Gillham v. St. Louis Southwestern R. Co., Tex.Civ.App., 241 S.W. 512, if the proof that the illusion occurred, that it caused plaintiff's injuries and almost caused Trevey and Wood to collide with defendant's cars, and that the earlier collisions happened under conditions substantially like those attending the incidents involving plaintiff, Trevey and Wood are not thought to be enough to rebut such an inference of contributory negligence. We note, incidentally, that this possibility of contributory negligence was not referred to in the decisions cited herein, nor have we seen it referred to in any other decision of a Texas court bearing on the admissibility of proof of other similar occurrences.

To deny Hickman's testimony such effect would relieve defendant of the duty of acting until someone informed defendant, in so many words, that motorists were being injured by the hazard causing plaintiff's injury; and such a result would give defendant a preferential right on a highway, which, after all was constructed for the use of the injured motorist. It may be true that defendant usually has a right to assume that cars upon the crossing are adequate warning of their presence to a motorist driving with due care, but if there

is any circumstance short of formal notice which ought to suggest that this assumption is not justified in fact, it is the happening of a collision between a motorist and defendant's cars.

Our conclusion is a logical consequence of the decision by the Court of Civil Appeals on the second appeal of Missouri K.' & T. R. Co. of Texas v. Long, 23 S.W.2d 401. In that case, the court held that the proof before them or near accidents was relevant on the issue of notice to defendant that certain conditions existed, tending to create an illusion that a crossing was open when it was actually blocked. Such proof would not be relevant on that issue unless the defendant was required to determine the cause of the near accidents. To the same effect, see: Evans v. Erie R. Co., 6 Cir., 213 F. 129, 133, "The rule is well settled in the federal courts that testimony of other accidents in the same place is admissible not only to show the dangerous character of the place, but also that knowledge thereof was brought to the attention of those responsible therefor." This decision follows that of the Supreme Court of the United States in District of Columbia v. Armes, 107 U.S. 519, 2 S.Ct. 840, 27 L.Ed. 618, which recognizes that if the defendant knew of persons having fallen at certain steps, this was some evidence of notice to that defendant that the steps were dangerous. The Armes decision is cited in Missouri K. & T. R. Co. v. Long, supra. Also see Central Texas & N.W. R. Co. v. Gibson, 35 Tex.Civ.App., 66, 79 S.W. 351, where the Court of Civil Appeals held admissible testimony similar to that held admissible in the Long decision.

■ There is no proof to rebut the inference of notice which we have drawn from Hickman's testimony. Defendant offered no evidence respecting the prior collisions to which Hickman referred. Under the circumstances, we hold that there was evidence to support the jury's findings under Issues 5 and 7, namely, that defendant was negligent in failing "to have a lighted flare stationed on the ground" at the crossing, and in failing "to maintain a lighted mechanical device or signal at said crossing."

■ B. We hold that the evidence is insufficient to show as a matter of law that plaintiff was guilty of contributory negligence.

■ It is to be borne in mind that if defendant had the right to assume, in the absence of notice to the contrary, that the cars alone were adequate warning of their presence upon the crossing to one approaching with due care, then plaintiff, in the absence of notice to the contrary, could assume that if he proceeded with due care he needed no notice of the cars upon the crossing except that afforded by the cars alone, and he was entitled to gauge the speed of his approach accordingly. This case involves a blocked highway, not a train of cars approaching the highway.

It is also to be borne in mind that according to plaintiff's theory of the facts, plaintiff did not receive from the cars the warning which he was entitled to expect and on which he had the right to rely. Plaintiff's theory of the facts is supported by evidence, for it may be inferred from the evidence that plaintiff had the same experience as did Trevey and Wood, that the car which he struck was unduly concealed from his view as he approached it, and that the resulting temporary illusion mislead him, causing him to believe that his way was clear until too late to prevent his colliding with defendant's car.

It cannot be said as a matter of law that plaintiff's speed of approach was excessive under these circumstances, and on this speed of approach depends the defendant's theory of plaintiff's negligence.

Plaintiff's speed, which he estimated at about 43 or 45 miles per hour, seems high, but it violated no statute and the information before us does not require a finding that this speed was excessive when measured by the warning plaintiff had a right to expect. The effective range of plaintiff's automobile headlights was not proved. There was no proof of the distance required for stopping the automobile at the speed at which plaintiff said he was traveling. And plaintiff (an experienced driver) thought that he could have stopped short of defendant's car if that car had been of another color. He testified:

"Q. If the cars had not been oil cars, but perhaps had been cars of another color, you think you would have seen them? A. I know I would have; I have demonstrated that."

Plaintiff did not expect to see a car upon the crossing. This, of course, is to be explained by his testimony that he had never seen a car upon defendant's track during the 13 years or more he had been passing over this crossing, and this circumstance tends to show that plaintiff's conduct was reasonable.

Plaintiff did not have the existence of the crossing in mind while he approached the crossing from Broussard's Curve, and he would not have slowed the speed of his approach if he had seen the two crossing signals referred to in our preliminary statement, but these matters simply indicate that he expected to rely on another sort of notice and can have no greater effect than to put him in the same position he would have occupied if he had actually realized he was approaching the crossing. Had he realized that he was, he would only have been required to use due care to have his automobile under such control that he could stop it in time to avoid a collision, and under plaintiff's theory of the facts, to which we have referred, the exercise of such care would not have protected him. Plaintiff's forgetfulness and his disregard of the roadside signals are thus without any particular significance (except as circumstances relevant to other fact issues) and it also follows that the fact of the collision, considered alone, does not tend to prove that plaintiff was negligent—if it ever does in these collision cases.

See: Gulf C. & S. F. R. Co. v. Picard, Tex.Civ.App., 147 S.W. 2d 303; St. Louis, B. & M. R. Co. v. Brack, Tex.Civ.App., 102 S.W.2d 261; Beaumont, S.L. & W. R. Co. v. Richmond, Tex.Civ.App., 78 S.W.2d 232; Missouri, K. & T. R. Co. v. Long, Tex.Civ.App., 23 S.W.2d 401; Orange & N.W. R. Co. v. Harris, 127 Tex. 13, 89 S.W. 2d 973.

These conclusions require that the judgment of the trial court be affirmed.