**ST. LOUIS, SOUTHWESTERN RAILWAY COMPANY OF TEXAS, Appellant,**

v.

**David DUFFY et al., Appellees.**

No. 15223.

Court of Civil Appeals of Texas.

Dallas.

May 17, 1957.

On Appellant's Rehearing Nov. 8, 1957.

Rehearing Denied Dec. 13, 1957.

O. O. Touchstone, Dallas, Clyde W. Fiddes and Roy P. Cosper, Tyler, for appellant.

Turner, White, Atwood, McLane & Francis and B. Thomas McElroy, Dallas, for appellees.

YOUNG, Justice.

David Duffy, a minor, age 18, by father Martin Duffy as next friend, and the latter individually, filed this suit against defendant Railway Company for damages arising from personal injuries suffered by David, also for doctors, hospital and medical expense allegedly incurred by the father as a result thereof. Basis of the action was an automobile collision with a standing train of defendant on night of February 16, 1955, by a 1941 Chevrolet automobile in which David Duffy was a passenger, and operated at the time by Irving A. Hoff, age 19. Upon trial and jury verdict, judgments were rendered for Martin Duffy in the sum of $1,500 and $50,000 for plaintiff's son; which rendition is the subject of this appeal.

The place of accident and attendant circumstances, both physical and otherwise, will be later detailed; but first to be stated are the jury answers in summary, which sufficiently reflect the material issues raised in pleadings of the respective parties and

the testimony (defendant primarily contending, however, that upon the record as a whole it was entitled to a peremptory instruction) : (1) That conditions surrounding the railroad crossing in question were such as to render it more than ordinarily dangerous as a nighttime crossing during switching operations; (2) defendant should have known that such crossing was more than ordinarily dangerous as a nighttime crossing during switching operations; (3) the failure to have a signal device there installed prior to the collision in question was negligence; (4) and such failure was a proximate cause of the collision; (5) failure to throw flares or fuses during switching operations on the night in question was negligence and (6) a proximate cause; (7) failure to have a flagman at the crossing during switching operations on the night in question was negligence and (8) a proximate cause of collision; (9) that the driver, Irving A. Hoff, on such occasion failed to operate his automobile at a rate of speed that was reasonable and prudent; (10) but that such failure was not the sole proximate cause of the collision; (11) Irving A. Hoff failed to apply his brakes until he was too close to such train; (12) but that such failure was not the sole proximate cause; (13) that the driving of said Chevrolet automobile with worn tires was not negligence; (15) that Irving A. Hoff drove his vehicle at a rate of speed which was excessive and dangerous; (16) that such manner of driving was negligence; (17) but that such negligence was not the sole proximate cause of the accident; (18) Irving A. Hoff failed to keep a proper lookout; (19) that such failure was not the sole proximate cause; (20) that Irving A. Hoff failed to have the 1941 Chevrolet under proper control; (21) that such failure was negligence; (22) but was not the sole proximate cause; (23) that Hoff, the driver, negligently failed to apply his brakes in time to avoid the collision; (24) such negligence was not the sole proximate cause; (25) Hoff, the driver, was not operating his Chevrolet at a speed in excess of 50 miles per hour; (28) his driving of the automobile with the lights dimmed was negligence; (29) but such negligence was not the sole proximate cause of collision; (30) failure of plaintiff David Duffy to warn the driver of the danger of driving with the lights dimmed was not negligence; (32) failure of said passenger-plaintiff to warn the driver of the approach to the railroad crossing was not negligence; (34) plaintiff's failure to request the driver to reduce the speed of his automobile as he approached the crossing was not negligence; (36) failure of such plaintiff to notice and apprise the driver of the presence of the train on the crossing was not negligence; (38) failure of the driver Irving A. Hoff to apply his brakes in time to avoid the collision was negligence; (39) but such failure was not the sole proximate cause thereof; (40) that the collision was not the result of an unavoidable accident; (41) that $1,500 would compensate plaintiff Martin Duffy for reasonable and necessary hospital and doctors bills; (42) that the sum of $50,000 would reasonably compensate the minor David Duffy for physical pain, mental suffering and loss of capacity to work and earn money.

The collision occurred at a railroad crossing in north Dallas County where Belt Line Road, a public Highway, crosses the tracks of defendant Railroad at grade; the crossing being south of the incorporated municipality of Addison, a small village or town. Belt Line Road runs almost due east and west, crossing defendant's tracks at right angles; the railroad running north and south with Addison immediately north of the crossing and Dallas to the south. At Addison, defendant's railway, Dallas branch, intersects with its Fort Worth-Texarkana line of railroad in a Y connection. Belt Line Road is a two-lane asphalt highway, 24 feet wide, with 10-foot graveled shoulders, and generally embraces Dallas County. As appellant points out, there are no curves or angles on either highway

or railroad track involved in this record. A slight decline in elevation or grade of 14.4 feet is evident as one approaches the crossing from the east on Belt Line, beginning at a distance of 1,500 feet; and defendant's exhibits 1, 2 and 3 depict the crossing as viewed from the east on Belt Line some 500, 200 and 100 feet away. There is a standard railroad warning sign erected by the Texas Highway Commission on the right of such highway 489 feet east of the grade crossing; also a statutory crossarm warning sign at left or south side, was present on defendant's right of way. Addison Road, a public highway, to the north intersects Belt Line Road 150 feet east of the crossing, and Inwood Road, running north from Dallas, intersects Belt Line some 85 feet west of the crossing.

The train involved was No. 318, destination Commerce, Hunt County, leaving Dallas at 7:55 P.M., with crew of engineer, fireman, conductor, head and rear brakemen, arriving at Addison approximately 8:30 P.M., at which place the connection occurs with Fort Worth train No. 18, the two trains stopping for an interchange of freight cars each night, train 318 consisting of two Alco diesel locomotives, some 38 freight cars and a caboose. On the night in question the Fort Worth train was already there when train 318 drew up to the railroad junction point and stopped preparatory to switching operations, with caboose and one car south of Belt Line Road crossing, one car standing on the crossing and another partially occupying same. This caboose, immediately south of crossing, was equipped with lights reflecting green on three sides and red at the rear; interior thereof lighted with an oil lamp. Only a minute or two had elapsed (Engineer Wilcox having just detached his engines "to do our switching"), when the collision occurred.

David Duffy and friend Irving A. Hoff were skating enthusiasts and earlier the same night had been at a rink in suburban Vickery. Hoff proposed a trip to Lewisville, Denton County, to see a new type rink, both leaving in Hoff's 1941 four-door Chevrolet car, proceeding to Belt Line Road via Preston Road, at an intersection a mile and a half east of the involved railroad crossing. The night was moonless, but cold and clear, no weather conditions that would interfere with visibility in driving on the highway—such as mistiness or rain. As they approached Addison, according to Duffy, the lights on the Hoff car were on low beam and good, brakes good, with no traffic on the highway. Both knew the railroad crossing was there, having traveled Belt Line before. Duffy testified to looking straight ahead as they went along at 45 to 50 miles per hour, describing the accident, viz.: "Well, as we neared the crossing, and as we passed, I noticed the sign and I glanced ahead to see if I could notice a train or anything. The sign told me—it didn't say anything about a train. I was looking to see if I could see anything; it seemed to me that the road just went straight ahead, straight ahead and then all of a sudden in about two or three seconds before we hit it, there was a big wall and there (that) was it." To be here noted is a stipulation between the parties that Hoff, driver of the car in which plaintiff was a passenger, had testified by deposition that because of injuries suffered at time of the collision he had no memory whatsoever of the particular trip or accident.

The Hoff automobile appears to have crashed into the train at a point between the two freight cars at north edge of pavement and with such force that it was practically demolished, setting fire to both freight car and automobile. David and driver Hoff were promptly extricated, but their car could be moved only with aid of a wrecker. (See defendant's exhibit 19 attached for one view of wrecked car.) First on the scene were Elliott, train conductor, and Fred Foley who had driven up on Belt Line Road from the west before the collision, but stopping at Inwood Road on account

of the blocked crossing. Two deputy sheriffs soon arrived at the scene, both testifying to automobile skidmarks extending 36 steps forward to point of impact. Pictures taken by a free-lance photographer just afterwards, and in evidence as numerous exhibits, graphically portray the scene of the accident; it being undisputed that the box cars crashed into were red in color, one with "Southern" painted on side in large white lettering, and figures "11139."

It is the contention of plaintiff that fact questions are raised under the circumstances of this record of an extra-hazardous railroad crossing—a condition that defendant knew or should have known in the exercise of ordinary care; and presented in issues 1 through 8. Appellant most earnestly takes the opposite view, asserting in sum that if the crossing in question be determined an unusually dangerous one, then "most any country crossing in the State of Texas" would be rendered extra-hazardous. In the first four points of error it argues insufficiency of the case made by plaintiffs as a matter of law; in effect, (1) of no evidence adduced that would sustain findings of either negligence or proximate cause against the railroad; (2) the uncontroverted record reflects that the collision was caused solely by the negligence of Hoff, the driver, or plaintiff, either or both; (3) total lack of evidence to sustain findings of negligence or proximate case against defendant; (4) error in the court's refusal to set aside jury findings 1–8 inclusive because so contrary to the overwhelming weight and preponderance of all credible evidence in the case as to be manifestly wrong. For due consideration of these points, a summary of evidence relied on by plaintiffs is in order.

Addison is a junction point for the Fort Worth and Dallas trains, according to defendant's train engineer, testifying by deposition; necessitating nightly interchange of cars or switching operations, train 318 from Dallas running "from 30 to 60 cars"; that the distance from the crossing to the intersecting Fort Worth line was about 33 cars, requiring a block of the crossing (Belt Line Road) if the freight train be of greater length; that on night of the accident train 318 consisted of 39 cars, with result that several cars were left standing south of and thus blocking said crossing. He also testified that from Dallas to Commerce his train stops only at Addison, Plano and Greenville, and that switching operations do not require the blocking of a public highway at the two other points. Others of the train crew stated that sometimes "as much as 30 minutes or more" pass from the time the Dallas train stops at Addison until it resumes its journey, but that Belt Line Road blocking is not for "more than two or three minutes" at a time, and that on the night of the accident Belt Line Road would have been cleared in "three or four minutes." In the same connection, C. C. Callaway, who operates a filling station and resides on Addison Road and adjacent to defendant's right-of-way, testified that Belt Line Road was blocked, in 1955 prior to the collision, "almost every night that you look out."

Over strong objection of defendant there was testimony of an accident and near-accidents experienced by highway travelers at the crossing either prior to February 16, 1955, or a few days thereafter. C. M. Hindman, cabinet maker living at Carrollton several miles to the west, with shop at Addison, testified to frequent travel between the towns; that the latter part of 1954 he was on way from Garland back to Carrollton at 9:00 or 9:30 o'clock at night, "looking straight ahead", when his wife called attention to the train across the highway, "and I had never seen the train, and I just went for my brakes and, of course, we got stopped all right, but I couldn't see the train at that time within one hundred feet of the track, I know." Roy Money, of Carrollton, whose business of delivering gasoline required traveling up and down Belt Line Road, testified to difficulty in seeing a parked train on the crossing on a dark night (no rain or fog, with car lights in good condition) until

close to the intersection; that unless same was new or newly painted, a freight car on the crossing would not reflect the headlights of his automobile. The standing freight car on the night of February 16 had been described by another witness as "dull red". T. W. Rutledge told of his experience at the crossing in 1949 or '50 at nighttime, traveling west; an occupant of his car calling attention to the train across Belt Line Road; that he stopped, but otherwise he "might have seen it or I might not have." George Meister related a similar happening two or three days after the Duffy accident; of traveling west on Belt Line Road around 6:00 o'clock in the morning and having to take off to the side over an abutment "and I was very fortunate that I landed safely on my four wheels," incurring some car damage; that he was familiar with Belt Line Road, having traveled it for more than a year prior thereto, and that road conditions had been in all respects similar. C. C. Callaway testified to observing similar occurrences two or three years before; that a man named Holloway, going same direction as the Hoff car, had run into a train there; and before that, a bunch of negro boys traveling east had gone into the ditch on opposite side to keep from hitting a train; also of a car going west two nights after February 16, 1955, the driver not seeing the train, applying brakes, of his jumping curb on south side of road and heading car down the right-of-way. Above instances of an accident and near-accidents were qualified as having taken place under similar conditions as the accident in question. Callaway, however, on page 63, statement of facts, describes the night as dark and misty, when, two years before, a car,

obviously that of the man Holloway, had collided with a train at this crossing.

Witness Callaway said that on account of structures lining Addison Road to the north, one could not see that portion of a standing train, only the part across and to the south of highway; that, due to the slope from the east, headlights of an automobile at night would be lower than the train, making it a little bit hard to see from that way, "especially with nothing to reflect." Roy Money also testified to the same condition, in that, when approaching the crossing at night, "your lights would shine under the train * * * you would have to get close up * * * the lights would go under * * *." On cross-examination he admitted to having always seen trains in time to stop and that if a motorist were looking for a train he could always see it. On the other hand, Foley, defendant's witness, who had assisted in rescuing the two boys, testified to having no difficulty in seeing the train (then moving over the crossing) from 100 yards away; that the crash occurred approximately one minute after both he and the train had stopped; also that he had no difficulty in seeing the caboose, its lights, and the conductor within.

W. C. Brandes, County Traffic Engineer, testified that Belt Line Road generally encircles Dallas County, passing through various outlying towns. In May 1954, and in official capacity, he had taken a traffic count at Belt Line and Preston Roads, one and one-half miles east of the subject crossing; following same by a letter to defendant suggesting that signal lights be installed there. In Footnote [1] is set forth the particular correspondence.

[1]. 
"Industrial Department
St. Louis & Southwestern Railroad
209 South Lamar St.
Dallas, Texas.

"Gentlemen:

"We are very desirous of increasing the protection to our County vehicle traffic using Belt Line Road at the crossing of your railroad directly south of the Town of Addison. Our County Belt

Line carries a considerable volume of traffic in this vicinity. We have actual volume counts on record showing a volume of over 1700 vehicles in a typical 24-hour day at a point approximately 1½ miles east of the crossing under discussion. Another count taken at a point approximately 3 miles west of here shows a volume of more than 600 vehicles per day. On basis of the importance of this particular Belt Line Road and the number of vehicles using it, we respectfully re-

In answer to above primary points of error, appellees summarize the foregoing outline of testimony; arguing that fact questions are thereby presented relative to aforesaid issues 1 through 8. A statement of principles bearing upon the subject-matter under discussion should first be stated:

(1) It seems to be universally recognized that trainmen in charge of a train which has blocked a public crossing with an object which is easily discernible, like a box car, have a right to assume that one traveling a highway and approaching the obstruction will adopt suitable lights and such a rate of speed as that he can bring his automobile to a stop before coming in contact with the obstruction, and consequently accidents by reason of an automobile driver running his car into a train on a crossing, whether standing or moving, cannot reasonably be foreseen and anticipated as a natural result of blocking the crossing. (Citing authorities.) 15 A.L.R. 901; 56 A.L.R. 1114; 99 A.L.R. 1454, and 161 A.L.R. 111. (2) "Before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous, as, for instance, that it is in a thickly populated town or city, that the view of the track is obstructed either by the company itself, or by other objects proper in themselves, or by the configuration of the land, or that the crossing is one which, for any reason, a reasonably prudent person in the exercise of ordinary care could not use with safety, or that the crossing is a much traveled one, and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railroad or other business, or by reason of some other such cause. In determining whether a railroad crossing is extrahazardous within this rule, each case must be viewed in the light of its own facts." 74 C.J.S. Railroads § 728, pp. 1350, 1351. Texas & N. O. R. Co. v. Beard, Tex.Civ. App., 91 S.W.2d 1080 (writ ref.). (3) A railroad company has "the right to assume, *in the absence of notice to the contrary*, that approaching travelers would gauge their speed according to the efficiency of their automobile headlamps and other equipment and according to existing apparent natural conditions, especially those affecting visibility of the road, such as darkness, rain and fog; and that despite lowered visibility from such natural agencies, due care by the approaching traveler would prevent a collision with defendant's cars without other notice of the presence of the cars than that afforded by the cars alone * * *." Texas & N. O. R. Co. v. Davis, Tex.Civ.App., 210 S.W.2d 195, 204. (4) The risk of harm to the traveler from the blocking of the high-

quest consideration of proper railroad officials to equip this crossing with the automatic type of railroad-crossing flashing signals. Will you please advise us as to official approval and probable installation date of such equipment."

"August 18, 1954.

"Mr. R. H. Clinger
County Engineer
Records Building
Dallas 2, Texas.

"Dear Mr. Clinger:

"Your letter of May 10, to the Industrial Department of the St. Louis Southwestern Railroad, regarding crossing protection at Belt Line Road, south of Addison, has been referred to me. Estimate has been prepared for the installa-

tion of flashing light signals at this crossing and the estimated cost is $4,223.76. I do not feel that the Railway Company would be justified in paying 100% of the cost of installation and will appreciate if you will advise what percent the County would be willing to bear of this expense in order to provide signal protection at this crossing.

Yours very truly, Signed: J. M. Lowry 16."

The County Engineer in answer to above communication refused to bear any of the expense incident to signal protection at this crossing; adding that "Dallas County feels that this is the railroad's duty." Belt Line Road had been widened some two years before, pavement resurfaced or rebuilt.

way by cars upon the crossing is treated as a reasonable incident of a lawful act, which could have been avoided by due care upon the traveler's part and against which the traveler is therefore required to protect himself. Texas & N. O. R. Co. v. Davis, supra, citing authorities. (5) As defined in the court's charge, by the term "extra-hazardous crossing" during nighttime switching operations is meant one which is shown to be more than ordinarily danger-ous; "attended with unusual or extra haz-ards—a crossing so peculiarly dangerous that prudent persons cannot use the same with safety unless extraordinary means are used to protect such crossing." (6) And although each case, whether or not involv-ing above issues, must turn upon its own facts, obviously, to raise the issue, evidence of special circumstances or peculiar condi-tions must be shown, additional to those attendant upon the usual "country cross-ing." The Texas cases so holding, point to existing obstructions; or conditions amounting to a trap or distraction; or illu-sion created in the mind of the traveler that would prevent an ordinarily prudent driver from observing that a crossing was occupied by a train in time to avert a collision therewith. Texas City Terminal R. Co. v. Allen, Tex.Civ.App., 181 S.W.2d 727 (writ ref.).

For example, in Missouri, K. & T. R. Co. of Texas v. Long, Tex.Civ.App., 293 S.W. 184; Id., Tex.Com.Rpp., 299 S.W. 854; Id., Tex.Civ.App., 23 S.W.2d 401 (writ ref.), the crossing was in a depression, with lights of the City of Temple shining above and beyond the crossing as approached by a night traveler (distraction or illusion). Likewise in Ft. Worth & Denver City Ry. Co. v. Looney, Tex.Civ.App., 241 S.W.2d 322, there were different levels in elevation of both highway and track, causing lights of automobiles to go under the train, to-gether with a glow of lights of the City of Henrietta appearing over the train, thereby creating the illusion of an open road ahead. In Beaumont, S. L. & W. R. Co. v. Rich-mond, Tex.Civ.App., 78 S.W.2d 232, the crossing was occupied by a flat car, pre-senting a barrier to the traveler's view of only eight inches, over which the lights of Sour Lake could be seen, also the railroad crossarm and switch light—night dark with haze and mist of rain. In Gulf, C. & S. F. Ry. Co. v. Picard, Tex.Civ.App., 147 S.W. 2d 303, the night was foggy, pavement wet and slippery. A gondola type car blocked the crossing, with more open space under-neath than the usual box car, plaintiff's automobile lights shining thereunder; similarly as to approaching cars, and causing him to think the way was clear. In Thompson v. Royal, Tex.Civ.App., 181 S.W.2d 317, the first of a three-track crossing was obstructed by switch engine and houses, plaintiff failing to see approach-ing passenger train on the second track un-til too late, and in St. Louis, B. & M. Ry. Co. v. Brack, Tex.Civ.App., 102 S.W.2d 261, the train had been standing across the high-way longer than the statutory five minutes, a low tank car on the crossing with taller yellow cars on either side, producing the impression that the train had been broken so as to leave the crossing open.

It has been difficult, indeed, to compre-hensively appraise the facts of this record; viewing the same as we must from a stand-point most favorable to the prevailing party. At first blush the jury's answers would appear as supported by competent testi-mony; but on a more careful analysis thereof we have concluded that the standing train on the crossing was adequate warning of its presence to users of this highway; in other words, that the switching opera-tion in question involved no special circum-stances or hazardous conditions, and con-sequently, there was no duty of additional warnings as charged. We will now con-sider the factors, which, one or all, in plaintiff's view constitute a showing of extra-hazardous crossing and a jury ques-tion.

(1) First to be listed are defendant's nightly switching activities blocking the highway when the makeup of train 318 was more than 33 cars. These cars had

been on the crossing only some two minutes. Defendant's obligation to take extraordinary precautions does not include extra *statutory measures against dangers* arising merely from an ordinary operation of the railroad. (2) From Callaway's property on up Addison Road to the north are houses, garages and other structures well obscuring that part of train 318; leaving visible to a traveler from the east, according to appellees, a view only of the cars on and south of the highway; constituting an obstruction, and material to issue 1 of a dangerous nighttime crossing. However, defendant's exhibit No. 2 of the locale (shown herewith) from a distance of 200 feet east, reveals an ample view of the crossing; the houses, etc., to the north not visible except to a minimal degree. The obstructions complained of along Addison Road, in our opinion, would have relevancy only to a vehicular collision caused by defendant's train in its *approach* to the crossing from the north. (3) Messrs. Callaway and Money testified that, due to the gradual slope of highway from the east, auto lights are lowered and would go under the train, would not hit the box cars "until close up"; the latter witness testifying similarly of an automobile parked on opposite side of the blocked crossing, that it "looked like you are meeting a car." David Duffy did not testify to the described phenomena and in consequence that he or the driver Hoff were misled thereby; nor did any one of the witnesses who had experienced near-accidents make reference thereto.[2] Neither was there testimony tending to show that defendant knew or should have known (aside from the safety history record of the crossing and letter of Brandes next to be noted) of the described illusive factors. "Proof of illusion which

misled motorist to believe that railroad crossing was not blocked, and of the circumstances which created such illusion, is not enough to support a finding that railroad either knew or should have known that such an illusion would result from existing circumstances." Texas & N. O. R. Co. v. Davis, Tex.Civ.App., 210 S.W.2d 195, syl. 6. (4) A history of near-accidents is insufficient as notice to the railroad, on the primary issues here sought to be established. Texas & N. O. R. Co. v. Davis, supra. Also inadmissible and of no probative force in this connection was the statement of Callaway concerning the Holloway incident of running into a train at the crossing two years before, the circumstances so far as known being entirely dissimilar. (5) Effect of the Brandes letter as notice; this case involving a blocked crossing and not a train approaching the highway,. The correspondence calls attention of the railroad to advisabilty of increased protection at the crossing because of heavy travel along and in vicinity of Belt Line Road; and manifestly relates to a warning of approaching trains rather than to precautions additional to the notice afforded by cars already upon the crossing. "The use of signs, signals, and warnings is for the purpose of letting persons using the highway know of the presence of the crossing, and that a train is approaching the highway. Under the facts in this case, after the train had completely blocked the highway and was lawfully passing over the highway, it was within itself sufficient warning to persons using the highway to beware of the train." Texas & N. O. R. Co. v. Stratton, Tex.Civ.App., 74 S.W.2d 741, 743.

As raising the issue of extra-hazardous crossing, plaintiffs alleged that "The dull,

2. We are cognizant of the fact that in Missouri, K. & T. R. Co. of Texas v. Long, Tex.Civ.App., 293 S.W. 184, the car occupants did not testify to any misleading effects of the City of Temple electric lights shining above and beyond them as their car approached the crossing, but the point of relevancy does not appear to have been raised. By way of

contrast, in Texas & N. O. R. Co. v. Beard, supra, plaintiff herself testified to automobile lights shining under train on account of railroad track elevation, thus creating the illusion of an open unobstructed road. Notwithstanding this, the case was reversed and rendered on basis of the entire record.

dark color of defendant's box cars on the crossing obscured plaintiff's vision on the night of said accident and blending with the night and with the dark color of the road pavement failed to reflect the light of the headlights of the car in which plaintiff was riding sufficiently and in time to apprise plaintiff of the danger he was approaching"; thus presenting a peculiar situation of danger similar to that reflected in the Davis case, supra, where a jury verdict was sustained. The two situations were not at all parallel. Two black or dark-colored tank cars were involved in the Davis case, night dark, wet pavement, dark-colored; the Court holding that even *those* conditions did not put defendant on notice of the particular hazard, nor did the fact of near-accidents. The notice there held sufficient to raise the issue of extra dangerous crossing was contained in the testimony of a deputy sheriff who detailed several actual collisions previously occurring at the location under almost identical circumstances. Absent the safety history just noted, said the Beaumont Court, "There was nothing on or adjacent to the highway which could have obscured plaintiff's view of the crossing, or distracted his attention. The country adjacent to the road was level. Under ordinary conditions of visibility, the crossing was not hazardous."

The injuries suffered by David Duffy on the occasion were admittedly serious and lasting; and equally serious is our responsibility in the matter of determining defendant's liability therefor. We conclude that the principle followed in Texas & N. O. R. Co. v. Stratton, supra, is likewise controlling of the instant subject-matter. The San Antonio Court there cited with approval the following language of Philadelphia & R. R. Co. v. Dillon, 1 W.W.Harr. 247, 31 Del. 247, 114 A. 62, 65, 15 A.L.R. 894, as illustrative of that principle: "Here, then, the railroad company had a right to assume that the plaintiffs would act in a reasonable way to avoid running into the train of box cars while it was lawfully standing across the highway. If the defendant's trainmen had a right to assume that a reasonably careful man driving an automobile on a highway at night would use such lights and adopt such a rate of speed as that he could bring his machine to a standstill within the distance that he could plainly see by the lights on his machine a railroad box car twelve feet high standing across the highway motionless on a railroad track, and completely obstructing his passage along a straight unobstructed highway, then the defendant did not then omit to perform any duty by not showing lights, or giving other warning of the presence of the train."

In harmony with the conclusions hereinabove reached, we must sustain appellant's first, third and fourth points, rendering unnecessary a consideration of any further points of error. The judgment under review is accordingly reversed and here rendered in favor of appellant, St. Louis, Southwestern Railway Company of Texas.

DIXON, Chief Justice.

The opinion on rehearing heretofore submitted in this case is withdrawn and the following opinion is substituted:

In my opinion the appellees' motion for rehearing should be sustained.

Appellee-plaintiff was a guest passenger in an automobile driven by another person. At about 8:35 P.M. on the night of February 16, 1955, the automobile was driven almost head on between two coupled freight cars of a standing freight train, which was blocking the crossing where Belt Line Road crosses the railroad tracks. The car in which appellee was a passenger had been proceeding west on Belt Line Road.

A jury found that the crossing was more than ordinarily dangerous as a nighttime crossing during switching operations; and that the Railway Company, appellant,

was negligent (1) in failing to have a signal device installed; (2) in failing to throw flares or fusees pending switching operations at night; and (3) in failing to have a flagman at the crossing during switching operations at night. Each failure was found to be negligence and a proximate cause of the collision. The jury also found that the driver of the automobile was negligent in several particulars, none of which was the sole proximate cause of the collision. The jury made further findings which had the effect of acquitting appellee, a guest passenger, of contributory negligence. It was on the basis of this jury verdict that judgment was rendered in favor of appellee.

In reversing the judgment in favor of appellee and rendering judgment in favor of appellant we held in our original opinion that there was no evidence to support the jury finding that the crossing was more than ordinarily dangerous as a nighttime crossing during switching operations. As a consequence of such holding we then further held that there was no duty on the part of appellant to furnish a signal device, or flares, or a flagman to warn motorists that the standing freight train was blocking the crossing.

I find myself unable to agree that there was no evidence in favor of the jury verdict. In my opinion there is evidence of probative force in the record, and it is sufficient to support the jury verdict. To support such opinion it becomes necessary for me to set out in some detail the material portions of the evidence supporting the jury verdict.

Robert H. West, County Surveyor of Dallas County, testified that Belt Line Road is an asphalt paved highway which, about two years prior to the date of this trial (February 1956), had been widened and resurfaced so that it has a right-of-way 100 feet wide and a pavement which averages 24 feet in width. The highway at this point runs east and west. At the south edge of the incorporated Town of Addison the highway crosses the tracks of the St. Louis,

Southwestern Railway Company, which tracks run in a north-south direction. At a point 1500 feet east of the railroad crossing Addison School House is located on the highway. Opposite Addison School House, according to West, Belt Line Road crosses over the crest of a hill, and a person driving west on the road, even in daytime, gets his first view of the railroad tracks or an object on them as he comes to the crest of this hill 1500 feet from the crossing. At this point the highway begins to slope downward, the incline amounting to 14.4 feet in the 1500 feet. (Appellant's employee Walker, a civil engineer, was asked whether this incline is "appreciable, or slight, or would the eye notice it?" He said that it was a slight grade, but also said "Well, your eye would notice it.") At a point about 500 feet east of the crossing is a railroad sign 38 inches in diameter standing about four feet off the ground, with crossed arms and an "R" on each arm.

Inwood Road, also asphalt paved, runs between the City of Dallas and Belt Line Road in a general direction parallel to the railroad, and comes to an end at Belt Line Road about 85 feet west of the railroad crossing. Addison Road, another asphalt paved thoroughfare, begins at Belt Line Road about 165 feet east of the crossing and runs north into the Town of Addison. About 1000 feet north of the railroad crossing at Belt Line Road is the railroad depot for the Town.

A map and plat drawn to scale by West was put in evidence. It shows that two branches of the St. Louis, Southwestern Railway meet at Addison. One of these branches runs from Addison to Fort Worth, Texas; the other branch runs from Addison to Dallas, Texas. The point of meeting of the two branches is about 1600 feet north of the railroad crossing at Belt Line Road. There are several switching tracks including a "Y" track, which begins about 600 feet from the crossing at Belt Line Road. A number of buildings are shown along the west side of Addison Road, beginning with a service station located near and facing the

intersection of Addison Road and Belt Line Road. Belt Line Road runs west from the crossing toward the Town of Carrollton. A copy of the plat is submitted herewith.

William C. Brandes, County Traffic Engineer of Dallas County, also testified. He stated that Belt Line Road encircles the County, the outer-loop going clear around through most of the County towns. In May 1954 he caused a count of vehicular traffic to be made on Belt Line Road between Preston Road and the Railroad crossing, at a point about 1½ miles east of the railroad crossing. This count showed a volume of over 1700 vehicles in a typical 24-hour day. At another count taken about three miles further west a volume of 600 vehicles per day was shown. These figures were included in a letter Brandes sent to appellant railroad, which letter will be copied and discussed later in this opinion.

Brandes also testified that since the taking of the above count, the amount of traffic on Belt Line Road has increased by virtue of the fact that the County towns have been growing greater in population, especially the towns that Belt Line Road goes through.

He further testified that in March 1955 he took two other traffic counts, one on each side of the railroad crossing, but closer to it than the counts the year before. These later counts showed a volume of traffic west of the railroad crossing on Belt Line Road of 1736 vehicles and east of the crossing of 1670 vehicles in a 24-hour day.

With respect to the volume of traffic in the vicinity of the crossing, appellant's witness Wilcox, engineer of the train, testified that Belt Line Road is a "main thoroughfare" with "much traffic", and that Inwood Road is a "paved street" and that there is "much traffic" on it.

The evidence shows that every night two freight trains meet at Addison, one from Fort Worth, Texas and the other from Dallas, Texas. These two trains stop to permit switching of freight cars between them. There is evidence from appellant's trainmen that these switching operations do not last

longer than four or four and a half minutes, but there is other evidence that they sometimes take 25 minutes or more. At intervals during this operation the railroad crossing involved here is often blocked, as it was the night of this collision, by a standing string of freight cars. In fact, C. C. Callaway, a service station and grocery store operator, whose property lies adjacent to the railroad right-of-way at the railroad crossing and also adjacent to Belt Line Road and Addison Road, testified that the trains block Belt Line Road "almost every night."

Appellant asserts that no switching operations were in progress or had been in progress at the time of the accident and that "switching operations" ought not to be brought into the record. I am unable to agree with appellant on this point.

The engineer of the Dallas train, J. W. Wilcox, testified by deposition. His train left Dallas at 7:55 o'clock P.M. and arrived at Addison at about 8:30 o'clock P.M. The Dallas train ordinarily includes from 30 to 60 cars. The Fort Worth train usually includes 50 to 70 cars. Sometimes 20 or 30 cars are switched at Addison from the Dallas train to the Fort Worth train, and a number of cars are switched from the Fort Worth train to the Dallas train. The distance from the Fort Worth line to the Belt Line Road crossing on the Dallas line is 33 or 34 cars' length. On the night of the accident there were 39 cars in the Dallas train. Thus the Dallas train, after it came to a stop, extended four, five or six cars on the other side of the Belt Line Road crossing.

Wilcox also testified as to the switching procedure usually followed and actually followed on the night of the accident. The Fort Worth train as usual was the first to arrive at Addison Junction. When the Dallas train arrived it stopped with four or five or six cars extending across the Belt Line crossing. The diesel locomotive on the Dallas train was detached and took its place on the "Short One" track of the "Y" while the locomotive from the Fort Worth train did the actual switching. The cars to be switch-

PLAT SHOWING THE INTERSECTION OF THE
BELT LINE RD & THE ST LOUIS &
SOUTHWESTERN RAILROAD, CITY OF
ADDISON, DALLAS COUNTY, TEXAS.

SCALE: 1"= 60'

ROBT. H. WEST
LICENSED STATE LAND SURVEYOR
COUNTY SURVEYOR

ed were on the front part of the Dallas train. It was while the Dallas train's locomotive was standing on the "Short One" track of the "Y" that the accident occurred. The testimony of Wilcox is corroborated in substance by the witnesses Boyd, Robinson, and Slayton, who were also trainmen. Though the actual exchange of cars from one train to the other took place several hundred feet north of the Belt Line Road crossing, the stopping of the trains and the blocking of the crossing were part of the overall switching operation.

The record also contains evidence of the following: (1) A certified copy of a weather report showed that on the night of the accident there was "no moon." Appellee Duffy testified that it was a "dark, cold night." The witness Callaway testified that it was a dark night.

(2) Ray Elliott, conductor on the Dallas train the night of the accident, testified that the boxcars involved in the accident were a dull red color with white lettering. C. C. Callaway testified: "* * * The Court: I think he is asking you about your own experiences about it, Mr. Witness, the same kind of a night, the same kind of a night, what, in your experience with respect to seeing a train up there on the track, whether or not you had any difficulty in seeing it. A. Well, the fairest way that I could answer that, that it is not too plain to see. * * * They are not too plain; there is nothing on the cars to reflect—like I always see them, it is very dull, and it is more or less hard to see, I would say. In other words, your lights are lower, I would say, than the train; it would be a little hard from that way, especially, with nothing to reflect. That would be my way of the description of it." C. M. Hindman speaking about his near accident at the crossing, testified: "* * * Were the lights of your car reflected by the boxcars of the defendant? A. Not the one directly on the crossing. It was the one directly to the right of the crossing which was a newly painted or a new car, which the one at the crossing itself was somewhat faded, dirty or something; in other words, it wouldn't reflect the light."

(3) As already stated, westbound automobiles, approaching the crossing, must travel down a gradual slope of 14.4 feet in a distance of 1500 feet to the crossing. At least part of the beam from the headlights of such automobiles goes under the boxcars. In this connection the witness Roy Money, a resident of Carrolton, Texas, testified that he is familiar with Belt Line Road, having had occasion many times to go up and down it at night driving a gasoline truck. His testimony continued as follows:

"A. I went up there at night. Your lights would shine under the train; there would be a car parked on the other side and it looked like you were meeting a car— * * *

"The Court: Let him state what his experience was; not what everybody else's was. * * *

"A. I went along there and with a train parked there and you would have to get close up—the lights would go under this train and before you could see it and the car on the other side of it, when their lights would come underneath—well, it is difficult to see.

"Q. (By Mr. McElroy) Would your lights be reflected by the boxcars which happened to be on the crossing? A. No, it wouldn't hit the boxcars; it would—the lights would go under. * * *

"Q. (By Mr. McElroy) Are you testifying to your personal experience, Mr. Money? Your personal experience on the road in the weeks immediately prior to February 16, 1955? A. That's right, my personal experience."

(4) Appellee Duffy testified as follows: "Well, as we neared the crossing, and as we passed, I noticed the sign and I glanced ahead to see if I could notice a train or anything. The sign told me—it didn't say

anything about a train. I was looking to see if I could see anything; it seemed to me that the road just went straight ahead, straight ahead and then all of a sudden in about two or three seconds before we hit it, there was a big wall and there was it." He further testified: "Q. And which way were you and Bing Hoff looking at the time you passed that warning sign? A. Straight ahead; I was looking to see if there wasn't a train on the tracks. Q. You were looking for a train? A. Yes, sir, but I couldn't see anything; it just looked like the road."

(5) It was stipulated that the injuries suffered by the driver of the automobile obliterated all memory of the accident, so he did not testify.

(6) The witnesses Callaway, Hindman, Rutledge and Meister testified to one collision and several near collisions at the Belt Line Road crossing.

The evidence above set out together with record evidence of other facts, seems to me to support the jury verdict that the railroad crossing was more than ordinarily dangerous as a nighttime crossing during switching operations. This view finds support in the following cases: Gulf, C. & S. F. Ry. Co. v. Picard, Tex.Civ.App., 147 S.W.2d 303, and Texas & N. O. R. Co. v. Dickson, Tex.Civ.App., 72 S.W.2d 384 (switching operations); Ft. Worth & Denver City Ry. Co. v. Looney, Tex.Civ.App., 241 S.W.2d 322; Texas & N. O. R. Co. v. Davis, Tex.Civ.App., 210 S.W.2d 195; Missouri, K. & T. R. Co. of Texas v. Long, Tex.Civ.App., 23 S.W.2d 401 (accidents and near accidents; and background lights producing an illusion); Gulf, C. & S. F. Ry. Co. v. Picard, supra, and Texas & N. O. R. Co. v. Dickson, supra (amount of traffic).

■ Appellant Railway Company is charged with notice and knowledge of the permanent conditions at the crossing. It is also charged with notice and knowledge of some of the temporary conditions existing at and near the crossing, such as the fact that it conducted switching operations nightly at Addison, and that as a result its trains frequently blocked Belt Line Road; also that there are dark and light phases of the moon, and that the night in question was dark, without moonlight.

■■ In my opinion the undisputed evidence supports the conclusion that appellant either knew or should have known of other factors tending to make the crossing more than ordinarily dangerous. On May 10, 1954, the County Engineer of Dallas County, acting by and through the County Traffic Engineer William C. Brandes, sent the following letter to appellant:

"We are very desirous of increasing the protection to our County vehicle traffic using Belt Line Road at the crossing of your railroad directly south of the Town of Addison. Our County Belt Line carries a considerable volume of traffic in this vicinity. We have actual volume counts on record showing a volume of over 1700 vehicles in a typical 24-hour day at a point approximately 1½ miles east of the crossing under discussion. Another count taken at a point approximately 3 miles west of here shows a volume of more than 600 vehicles per day. On the basis of the importance of this particular Belt Line Road and the number of vehicles using it, we respectfully request consideration of proper railroad officials to equip this crossing with the automatic type of railroad crossing flashing signals. Will you please advise us as to official approval and probable installation date of such equipment."

On August 18, 1954, appellant replied stating that a study had been prepared showing an estimated cost of $4,223.76 for the installation of signal lights at the crossing, but further stating that appellant did not feel it should bear all of the cost of such installation, and inquiring what percent of the cost Dallas County was willing to bear.

On September 8, 1954, the County Engineer by letter informed appellant that the County was not in position "to bear any of the expense to provide signal protection at this crossing. In fact Dallas County feels that this is the Railway's duty."

The above correspondence was admissible in evidence on the issue of notice to the Railway Company. Ft. Worth & Denver City Ry. Co. v. Looney, Tex.Civ.App., 241 S.W.2d 322. It was admitted over appellant's objection, but without limitation—no limitation as to purpose was requested. In my opinion it certainly put the Railway Company under an obligation to inquire about and to investigate the conditions and past happenings at the crossing. I think it was its duty to do so. Some of the testimony of that nature came from C. C. Callaway, the man who operates the service station and grocery store next to the crossing. He was easily accessible for inquiry.

As I see it, we should have overruled appellant's points Nos. one, three and four.

Appellant's point of error No. two asserts that the uncontroverted record reflects that the accident and damages were caused *solely* by the negligence of the driver of the automobile or by plaintiff. As we have pointed out above, there is evidence to support the jury's finding that appellant-defendant was also negligent. Point No. two should be overruled.

Point No. five is that the trial court erred in overruling appellant's objection to special issues Nos. one to eight inclusive. These are appellee-plaintiff's issues in regard to appellant's alleged negligence. Without copying said issues or appellant's rather lengthy objections, I shall simply say that the issues seem to present the fact questions properly in connection with the law as laid down in the cases I have cited in connection with points Nos. one, three and four. Point No. five should be overruled.

Point No. six alleges that the award of $50,000.00 to plaintiff was excessive. The evidence shows that appellee David Duffy was 18 years of age and a senior in High School at the time of the accident. His life expectancy was 48.32 years. He planned to enter the Air Force and become a pilot. During summer vacations he had worked at a watermelon stand, on a milk truck, and as a package boy at a grocery store. As to his injuries: Appellee had a compound fracture of his left thigh bone; he had a fracture of the jaw bone; his left cheek bone was crushed; he suffered internal injuries to his chest and lungs which necessitated his being kept under an oxygen tent for about two weeks; when under the oxygen tent he thrashed his arms and moaned much of the time; sometimes he would black out; he endured great pain and suffering; he had a tube through his nose to his stomach and another tube to his bladder; he was given fluid through his veins; because of his general condition he could not be given a general anesthetic until March 3, 1955; a wire was placed in his leg just below the knee; he was kept in traction for six to eight weeks after he first entered the hospital; later he was placed in a double spica cast, which goes from the lower chest down one entire leg and down to a point just above the knee on the other leg; he wore casts until July 20; afterward he wore braces; x-rays taken in August show a 25-degree angle in his femur; one leg is almost an inch shorter than the other; he is permanently crippled; he must wear a heel or wedge, or add a great deal of strain to his back; he was in bed 140 days after going home; his leg is weak, and gives out every once in a while; his hospital and medical expenses, paid by his father, were $2030.20. Space does not permit further details concerning his injuries. Appellee David Duffy, his father Martin Duffy, Dr. Driggs and Dr. Kipp testified at length about them. I cannot say that the damages were excessive. Appellant's point No. six should be overruled.

■ In point No. seven appellant says that appellees, acting by and through their attorneys, interfered with, hindered and suppressed the right of appellant to investigate whether the jury had indulged in prejudicial misconduct in their deliberations. The basis of this claim is a letter sent to each of the jurors after the trial in which appellee's attorneys said:

"I anticipate that representatives of the Defendant, probably claim agents, will be contacting you in an effort to talk about the lawsuit and the nature of your deliberations. You may talk to them or not as you choose, but it is correct and proper for me to advise you that their purpose in talking to you will be to upset your verdict by trying to convict you of jury misconduct. I want this verdict to stand, and I am sure that you do too, and that you do not want it to be impeached, and I am asking that if you are contacted by representatives of the railroad, you will tell them that you will discuss the case and your deliberations, if at all, only with the attorney for the Plaintiff present, so that there will be no misunderstanding. Then in that event I will make arrangements to be present at any time any discussion is felt necessary."

In my opinion appellant has not shown reversible error in connection with point No. seven. In the first place, appellant did not comply with Rule 327, Texas Rules of Civil Procedure. The record does not show that appellant sought to introduce evidence or affidavits from the jurors or others of jury misconduct. In the second place, I cannot say that the letter itself constitutes an attempt to suppress the right of appellant to determine and investigate whether the jury had been guilty of misconduct. Younger Bros., Inc. v. Ross, Tex. Civ.App., 151 S.W.2d 621, syl. 4; Goldstein Hat Mfg. Co. v. Cowen, Tex.Civ.App., 136 S.W.2d 867, syl. 16.

■ In point No. eight appellant says that the trial court erred in overruling appellant's objections to special issues Nos. 41 and 42. These issues inquire as to the amount of damages sustained (1) by Martin Duffy, appellee David Duffy's father, and (2) by David Duffy, the injured boy, "as a direct and proximate result *of the injuries, if any, sustained by David Duffy * * *.*" Appellant complains because the issues did not inquire the damages suffered "as a direct and proximate result *of the negligence, if any, of the defendant railroad.*" (Emphasis supplied.)

The complete issue as worded specifically names the elements of damages which the jury may take into consideration. Then follows these words: "all as a direct and proximate result of the injuries, if any, sustained by David Duffy *on the occasion in question.*" (Emphasis supplied.)

I am aware that a wording similar to that used in the court's charge has been held objectionable in several cases, including Anderson v. Reichart, 116 S.W.2d 772, and Standard Paving Co. v. Pyle, 131 S.W.2d 200, both by the Fort Worth Court of Civil Appeals. Nevertheless, under the circumstances of this case, I do not believe the wording of the issue as submitted constitutes reversible error. The issue as drawn expressly limits the compensation to the injuries sustained *on the occasion in question.* The jury is further limited by the language of the issue to such damages as it may find from a preponderance of the evidence. The jury was also instructed: "* * * in arriving at your answers to the questions submitted you cannot take into consideration any fact or circumstance not brought out in the testimony before you."

To paraphrase the language used by the court in Scott v. Gardner, 159 S.W.2d 121 (ref.w.m.), also by the Fort Worth Court of Civil Appeals, it is difficult for me to imagine how the jury in this case could ever have supposed, under the actual

charge given, and in view of the evidence, that the court was inquiring about any damages outside of those received by David Duffy when the car in which he was riding ran against appellant's freight train at the Belt Line Crossing on the night of February 16, 1955. The verdict elsewhere established causal connection between the negligence of appellant and the collision in which appellee Duffy was injured. I find in the record no evidence of prior infirmities "closely connected and intermingled" with the injuries suffered by Duffy on that occasion. Therein the present case may be distinguished from Dallas Ry. & Terminal Co. v. Ector, 131 Tex. 505, 116 S.W.2d 683, 685. In my opinion appellant's point No. eight should be overruled.

■ Points nine and fourteen relate to alleged error in admission into evidence of the Brandes letters, heretofore mentioned in connection with my discussion of points one, three and four; and admission of the traffic count, also discussed in said connection. I think these points should be overruled. As I have already said, the letters are admissible under the issue of notice. Ft. Worth & Denver City Ry. Co. v. Looney, Tex.Civ.App., 241 S.W.2d 322. Volume of traffic is a factor in determining whether a railroad crossing is more than ordinarily dangerous. Gulf, C. & S. F. Ry. Co. v. Picard, Tex.Civ.App., 147 S.W.2d 303; Texas & N. O. R. Co. v. Dickson, Tex. Civ.App., 72 S.W.2d 384.

In points 10, 11, 13, 16, 17 and 18 appellant contends that the court erred in admitting into evidence certain testimony as follows:

■ (a) The witness C. C. Callaway was asked whether a driver approaching the crossing would find it difficult to see a train parked on the crossing until he was very close to it. The court interpreted the question for the witness as follows: "The Court: I think he is asking you about your own experience about it, Mr. Witness, the same kind of a night, the same

kind of a night, what, in your experience with respect to seeing a train up there on the track, whether or not you had any difficulty in seeing it?" The witness answered: "A. Well, the fairest way that I could answer that, that it is not too plain to see. I have always seen them, myself, but I don't mean that everybody else has. I don't know how you had rather me to answer it, but that depends upon how fast you are going. They are not plain; there is nothing on the cars to reflect—like I always see them, it is very dull, and it is more or less hard to see, I would say. In other words, your lights are lower, I would say, than the train; it would be a little hard from that way, especially, with nothing to reflect. That would be my way of the description of it."

In my opinion, under the circumstances it was not reversible error to admit the testimony.

■ (b) Witness Callaway was also permitted to testify as to prior accidents, which he saw, and as to one accident which occurred two nights after February 16, 1955, which he also saw, under conditions similar to those which prevailed at the time of the instant collision; he further testified as to other occasions when the crossing was blocked. The witness has operated a service station next to the crossing since 1946. He has lived in Addison since 1901. He testified that he had driven over the crossing thousands of times. The testimony was admissible.

■ (c) The witnesses Money and Rutledge testified to conditions and to their experiences at the crossing. Money traveled the road "maybe once a week, twice a month." Rutledge testified to an experience about ten years previously when he stopped in time at the warning of a fellow passenger. He further testified "if he hadn't called my attention to it, I don't know—I might have seen it or I might not have." I do not believe that admission of the testimony was error, certainly not reversible error under the circumstances.

(d) The witness Hindman testified to a near accident at the crossing when he barely stopped his car in time to avoid a collision only after a warning from his wife, who was a fellow passenger. He had not seen the train at the time he was within a hundred feet of the crossing. I think the testimony was admissible. Points Nos. 10, 11, 13, 16, 17 and 18 should be overruled.

Point No. 12 alleges that the court erred in sustaining appellee's objection to a certain question propounded to the witness Callaway with respect to the speed of the automobile. Callaway, a service station operator, had testified that he did not know the speed at which the automobile was traveling but that he did know it must have been going pretty fast to demolish it that way. Then he was asked this question: "Now, if he skidded a hundred and eight feet with locked wheels on that paved surface and was demolished like that, would that indicate anything else to you about the speed it was going?" It was not error to sustain objection to the question because (1) at the time the question was asked there was no evidence before the court that the automobile had skidded 108 feet with locked wheels; and (2) the witness had already given his opinion about the speed of the car. Point 12 should be overruled.

Point No. 15 asserts that the court erred in overruling appellant's motion to declare a mistrial after the witness Hindman testified that lights are present at the crossing now. The following question and answer are shown in the record:

"Q. Now was there any change in the conditions surrounding that crossing either on the highway, any physical changes; were there any physical changes, at all, in the period immediately prior to February 16, 1955? A. Well, the only thing that I noticed is that there is lights at the crossing now."

Appellant admits that the question was proper and that the answer was unresponsive, but argues that the answer was so prejudicial that a mistrial should have been declared. Appellant objected and the objection was sustained. Appellant then moved for a mistrial, but did not request that the jury be instructed to disregard the witness's answer. Under the circumstances, I do not think that the judgment should be reversed on account of the unresponsive answer of the witness. Rules 434 and 503, T.R.C.P.; Walker v. Texas Employers Ins. Ass'n, Tex., 291 S.W.2d 298. Point No. 15 should be overruled.

Point No. 19 complains because the court sustained appellee's objection to certain proferred testimony of the witness Harding, a deputy sheriff, in regard to the speed of the automobile in question just before the collision, judging from the skid marks on the pavement. The court permitted the witness to testify that the car was going at a high rate of speed, but would not permit the witness to estimate the speed at a definite number of miles per hour. The record shows that the court, before sustaining appellee's objection, listened to testimony at considerable length touching the qualifications of the witness. Whether a witness is qualified to give opinion evidence is a question which rests largely in the discretion of the trial court. 19 Tex.Jur. 134; 32 C.J.S. Evidence §§ 449, 458, pp. 86 and 99. We cannot say the court abused its discretion here. No reversible error is shown. Wallace v. State, 143 Tex.Cr.R. 596, 160 S.W.2d 256. Point No. 19 should be overruled.

Points Nos. 20, 21 and 22 complain of alleged inflammatory jury arguments which could not be cured by objections and admonitory instructions, which arguments were calculated to cause the return of an improper verdict. The challenged arguments are quite lengthy, so I shall not copy them here. Suffice it to say that in my opinion the jury arguments did not constitute reversible error. Wade v. Texas Employers Ins. Ass'n, 150 Tex. 557, 244 S.W.2d 197. Points Nos. 20, 21 and 22 should be overruled.

■ Point No. 23 complains because the court refused to submit appellant's requested issues numbered 18, 19 and 20 in regard to alleged defective brakes being the sole cause of the collision. The court submitted the question of the application of brakes in issues Nos. 11 and 12 and Nos. 23 and 24; and Nos. 38 and 39. These issues were answered unfavorably to appellant. Moreover appellant's witnesses Harding and Vines testified, and their testimony is not contradicted, that the tire skid marks extended about 108 feet from the car. This would certainly indicate that the brakes were not defective. It is the only evidence bearing on that particular question I find in the record. Point No. 23 should be overruled.

Points Nos. 24 to 31 inclusive relate to the court's refusal to submit certain of appellant's requested issues; and points Nos. 35 to 41 inclusive complain of the court's refusal to submit certain requested instructions. Appellant submitted 93 requested issues and 10 requested instructions. The court's charge consists of 42 special issues together with a number of definitions. Issue No. 13 inquires about the worn condition of the tires on the automobile; Nos. 15–17 and 25–26 about the speed of the automobile; Nos. 18 and 19 about the lookout by Hoff, driver of the automobile; Nos. 20–22 about control of the car; Nos. 28 and 29 about driving with dimmed lights; and issues Nos. 30–37 about negligence on the part of appellee David Duffy. It seems to me that the charge fully submits appellant's defenses under the pleadings and evidence. Appellant's requested issues are either without support in the evidence or seek to submit other or different phases of the same issue. The requested instructions are inapplicable—especially since the case was submitted on special issues, not on a general charge. Appellant's requests were untenable. Rules 271, 274 and 279, T.R.C.P. Appellant's points Nos. 24–31 and 35–41 are overruled.

Points 32, 33 and 34 assert that the jury's answers to issues Nos. 10, 12, 17, 19, 22, 24, 29 and 39; and to No. 25; and to Nos. 30, 32, 34 and 36 were contrary to the overwhelming weight of the credible evidence. These issues inquired whether the negligence of the driver Hoff was the sole proximate cause of the collision; whether Hoff drove his car in excess of 50 miles per hour; and whether appellee David Duffy was guilty of negligence. Without further detailing the evidence, I am of the opinion that the answers of the jury were not contrary to the overwhelming weight of the evidence. Points 32, 33 and 34 should be overruled.

I have reached the conclusion that none of appellant's points on appeal disclose reversible error. As I see it, the motion for rehearing should be sustained and the judgment of the trial court should be affirmed.

CRAMER, J., concurs in the views above expressed and agrees that the motion for rehearing should be sustained and the judgment of the trial court should be affirmed.

DIXON, Chief Justice.

Since Justice CRAMER concurs with me in the views above expressed, my dissenting opinion becomes the majority opinion on rehearing.

Appellant's points on appeal are overruled. Our judgment heretofore entered reversing the trial court's judgment and rendering judgment for appellant is set aside and judgment is here entered affirming the trial court's judgment.

YOUNG, Justice (dissenting).

I adhere to the conclusions reached in the original opinion with respect to the points there discussed.

On Appellant's Motion for Rehearing.

■ On November 8, 1957, we withdrew our majority opinion of September 27, 1957, in which majority opinion we had sustained appellees' motion for rehearing. By withdrawing our opinion and setting aside our judgment of affirmance of September

27, 1957, we of course made the withdrawn opinion and the judgment we set aside inoperative and of no force and effect for any purpose whatsoever. But appellant had meantime filed a motion for rehearing. Upon the withdrawal of our opinion and the setting aside of our judgment, appellant's then pending motion for rehearing also became inoperative and of no force or effect. So we did not pass on said motion one way or another, neither sustaining nor overruling it.

Also on November 8, 1957, we substituted a new majority opinion in which we again sustained appellee's motion for rehearing, and entered our judgment affirming the trial court's judgment.

On November 22, 1957, appellant duly and timely filed its motion for rehearing, designated "Appellant's Second Motion for Rehearing", directed against our substituted opinion of November 8, 1957 and the judgment of affirmance of that date.

Appellant's motion for rehearing designated "Appellant's Second Motion for Rehearing" is overruled.